IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 14, 2012 Session

**STATE OF TENNESSEE v. NV SUMATRA TOBACCO TRADING COMPANY**

**Tenn. R. App. P. 11 Appeal by Permission from the Court of Appeals**
**Chancery Court for Davidson County**
**No. 03-1613(II)     Carol L. McCoy, Chancellor**

**No. M2010-01955-SC-R11-CV - Filed March 28, 2013**

This appeal concerns whether Tennessee courts may exercise personal jurisdiction over an Indonesian cigarette manufacturer whose cigarettes were sold in Tennessee through the marketing efforts of a Florida entrepreneur who purchased the cigarettes from an independent foreign distributor.  From 2000 to 2002, over eleven million of the Indonesian manufacturer's cigarettes were sold in Tennessee.  After the manufacturer withdrew its cigarettes from the United States market, the State of Tennessee filed suit against the manufacturer in the Chancery Court for Davidson County, alleging that the manufacturer had failed to pay into the Tobacco Manufacturers' Escrow Fund as required by Tenn. Code Ann. §§ 47-31-101 to -103 (2001 & Supp. 2012).  The parties filed cross-motions for summary judgment, and the trial court dismissed the suit for lack of personal jurisdiction over the Indonesian manufacturer.  The Court of Appeals reversed, granted the State's motion for summary judgment, and remanded the case to the trial court to determine the applicable fines. *State ex rel. Cooper v. NV Sumatra Tobacco Trading Co.*, No. M2010-01955-COA-R3-CV, 2011 WL 2571851 (Tenn. Ct. App. June 28, 2011).  We find that, under the Due Process Clause of the Fourteenth Amendment, Tennessee courts lack personal jurisdiction over the Indonesian manufacturer.  We therefore reverse the decision of the Court of Appeals and dismiss the case for lack of personal jurisdiction pursuant to Tenn. R. Civ. P. 12.02(2).

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the Court, in which JANICE M. HOLDER and CORNELIA A. CLARK, JJ., joined.  GARY R. WADE, C.J. filed a dissenting opinion, in which SHARON G. LEE, J., joined.

Steven C. Douse, Nashville, Tennessee; and Christopher L. Rissetto, Washington D.C., for the appellant, NV Sumatra Tobacco Trading Company.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; John H. Sinclair, Jr., Deputy Attorney General; and Rebekah A. Baker, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.**

This case takes place in the shadow of a nationwide settlement of litigation concerning the responsibility of the leading tobacco companies in the United States for the costs associated with the treatment of tobacco-related health conditions. Between 1993 and 1998, over 800 lawsuits, including 55 class actions and more than 600 individual claims, were filed against the tobacco companies seeking damages and other relief for the harmful effects of smoking.[1] Included among these lawsuits were actions filed by 42 states.[2]

Between July 1997 and May 1998, the tobacco companies settled with four states and, in doing so, agreed to pay these states $36.8 billion in damages.[3] On November 23, 1998, following negotiations between representatives of the tobacco companies and a negotiating team of eight state attorneys general,[4] the four largest domestic tobacco companies, controlling 98% of the cigarette market in the United States,[5] settled with the remaining 46

---

[1] Frank A. Sloan & Lindsey M. Chepke, *The Law and Economics of Public Health* 83 (2007).

[2] *See* Tobacco Control Archives, Tobacco Litigation Documents, State Lawsuits, UCSF Library, *available at* http://library.ucsf.edu/tobacco/litigation/states. Tennessee was among the eight states that did not sue the tobacco companies. Gregory W. Traylor, Note, *Big Tobacco, Medicaid-Covered Smokers, and the Substance of the Master Settlement Agreement*, 63 Vand. L. Rev. 1081, 1096 n.104 (2010) ("Traylor").

[3] W. Kip Viscusi, *Smoke-Filled Rooms: A Postmortem on the Tobacco Deal* 37 (2002) ("Viscusi"); Martha Derthick, *Federalism and the Politics of Tobacco*, 31 Publius: The Journal of Federalism, no. 1, at 47, 52 (Winter 2001); Frank Sloan & Lindsey Chepke, *Litigation, Settlement, and the Public Welfare: Lessons from the Master Settlement Agreement*, 17 Widener L. Rev. 159, 166 (2011) ("Sloan & Chepke").

[4] Seth M. Wood, Note, *The Master Settlement Agreement as Class Action: An Evaluative Framework for Settlements of Publicly Initiated Litigation*, 89 Va. L. Rev. 597, 634 (2003); *see also* The Ward, Kershaw and Minton Environmental Law Symposium: "Up in Smoke: Coming to Terms with the Legacy of Tobacco," *Tobacco Settlement Summary*, 2 J. Health Care L. & Pol'y 167 (1998).

[5] *See* Jeremy Bulow, Director, FTC Bureau of Economics, *The State Tobacco Settlements and*
(continued...)

states, the District of Columbia, and five territories of the United States.[6] The terms of this settlement are contained in the Master Settlement Agreement ("MSA").[7]

The MSA creates three types of tobacco companies. The first type includes the Original Participating Manufacturers ("OPMs") – the tobacco companies that originally entered into the MSA.[8] The second type includes the Subsequent Participating Manufacturers ("SPMs") – the tobacco companies that joined the MSA but are not the OPMs.[9] There are currently over 50 tobacco companies in the SPM category, and these companies represent most of the remaining 2% of the cigarette market.[10] The third type includes the Non-Participating Manufacturers ("NPMs") – the tobacco companies that are not part of the MSA.[11]

The settling states agreed to dismiss their pending lawsuits and to release their past and future claims against the OPMs and the SPMs. In return the OPMs agreed to make several regulatory concessions[12] and to make substantial monetary payments to the states.[13]

---

[5](...continued)
*Antitrust*, *available at* http://www.ftc.gov/speeches/other/abatobacco.shtm ("Bulow").

[6]The signatories on the settlement agreement included Philip Morris, Inc., R. J. Reynolds Tobacco Co., Brown & Williamson Tobacco Corp., and Lorillard Tobacco Co. Together, these companies had a 98% market share of the cigarette sales in the United States. The Liggett Group also signed the settlement agreement. *See* Bulow, *supra* note 5; Sloan & Chepke, 17 Widener L. Rev. at 170.

[7]Master Settlement Agreement (1998), *available at* http://oag.ca.gov/tobacco/msa.

[8]MSA § II(hh).

[9]MSA § II(tt).

[10]*See* Participating Manufacturers under the Master Settlement Agreement as of Nov. 5, 2012, *available at* http://www.naag.org/backpages/naag/tobacco/msa/participating_manu; *Mariana v. Fisher*, 338 F.3d 189, 193 (3d Cir. 2003).

[11]MSA § II(cc). These companies "almost exclusively market discount brand cigarettes" and are "often companies that were not in the U.S. market in 1998." Sloan & Chepke, 17 Widener L. Rev. at 171.

[12]The OPMs agreed
to restrict their advertising, sponsorship, lobbying, and litigation activities, particularly as those activities targeted youth; to disband three specific "Tobacco-Related Organizations," and to restrict their creation and participation in trade associations; generally to make available to the public documents the OPMs had disclosed during the discovery phase of their litigation with the settling states; and to create and fund the National Public Education
(continued...)

The NPMs have no financial obligations under the MSA. Accordingly, they were able to "enter the cigarette market and price cigarettes well below the average OPM's price without facing any consequences under the MSA." Traylor, 63 Vand. L. Rev. at 1105. To protect the OPMs from price competition from the NPMs, the MSA provides for a "Non-Participating Market Share Adjustment" ("NPM Adjustment"). MSA § IX(d)(2). This adjustment permits the OPMs to reduce their annual financial obligation to the states if they lose market share to an NPM.

The possible decrease in an OPM's annual payments could have serious financial consequences for the states. Traylor, 63 Vand. L. Rev. at 1106. Accordingly, the MSA provides that states can avoid the impact of the NPM Adjustment by adopting a "qualifying statute."[14] The purpose of this statute is to neutralize the NPMs' cost advantages by requiring them either to join the MSA or to establish an escrow or reserve account to secure damage awards for any successful cigarette-related claim the state might obtain from the NPM. The amount of these annual payments is based on the number of cigarettes sold by an NPM during a particular year. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1164 (10th Cir. 2012). Any funds remaining in an NPM's escrow account are restored to the NPM 25 years after they have been placed in the account. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 63 (2d Cir. 2007).

Tennessee was one of the 46 states that approved the MSA on November 23, 1998. In 1999, the Tennessee General Assembly enacted the "Tennessee Tobacco Manufacturers' Escrow Fund Act of 1999"[15] in order to satisfy the requirements of MSA § IX(d)(2)(E).

---

[12](...continued)
Foundation, dedicated to reducing youth smoking and preventing diseases associated with smoking.

*KT & G Corp. v. Attorney Gen. of Okla.*, 535 F.3d 1114, 1119 (10th Cir. 2008).

[13]The OPMs agreed to make $12.7 billion in up-front payments between 1998 and 2003. MSA § IX(b). Beginning in April 2000, the OPMs also agreed to make annual payments in perpetuity to an escrow fund that would be paid out to the states based on an allocation formula agreed to by the states. MSA § IX(c). The amount of these payments does not depend on the volume of sales of cigarettes within each state. *KT & G Corp. v. Attorney Gen. of Okla.*, 535 F.3d at 1120. Between April 2000 and April 2025, the aggregate amount of the annual payments from the OPMs will total $190 billion. W. Kip Viscusi, *Smoke-Filled Rooms: A Postmortem on the Tobacco Deal* 44 (2002).

[14]MSA § IX(d)(2)(E). The MSA includes a model statute as "Exhibit T."

[15]Act of May 17, 1999, ch. 278, 1999 Tenn. Pub. Acts 630, 630-35 (codified as amended at Tenn. Code Ann. §§ 47-31-101 to -103 (2001 & Supp. 2012)).

Tenn. Code Ann. § 47-31-103(a) requires "[a]ny tobacco product manufacturer selling cigarettes to consumers within the state of Tennessee" after May 26, 1999, either to become a participating manufacturer by joining the MSA or to begin making payments into a "qualified escrow fund."

## II.

Pacific Coast Duty Free ("Pacific Coast"), a company located in California, purchased a large quantity of cigarettes from an Indonesian cigarette manufacturer named NV Sumatra Trading Company ("NV Sumatra"). The cigarettes were labeled United brand "American Blend" cigarettes. Pacific Coast was unsuccessful in marketing these cigarettes in the United States and decided to sell them in bulk to another distributor. In 1999, Pacific Coast sold its entire inventory of United brand cigarettes to a Florida entrepreneur named Basil Battah.

At one point, Mr. Battah owned and operated a car alarm company named American Automotive Security. In 1986, American Automotive Security started doing business as FTS Distributors ("FTS") and began importing cigarettes. Nobody else was marketing United brand "American Blend" cigarettes in the United States in 1999, when Mr. Battah purchased Pacific Coast's remaining inventory of United brand cigarettes. He took the cigarettes to tobacco industry trade shows and advertised them in trade magazines. Before long, he sold them all and decided to purchase more cigarettes from NV Sumatra. Mr. Battah also hoped that he would be able to generate enough sales to convince NV Sumatra to grant him the exclusive right to distribute and sell its cigarettes in the United States.

NV Sumatra had already made arrangements for the distribution of its cigarettes. It sold its United brand cigarettes to Unico Trading Pte., Ltd. ("Unico"), a distribution company based in Singapore. In turn, Unico sold the United brand cigarettes to Silmar Trading, Ltd. ("Silmar"), a tobacco distribution company based in the British Virgin Islands. Thus, when Mr. Battah contacted NV Sumatra about purchasing cigarettes to sell in the United States, he was referred to Nabil Hawe, a Silmar employee residing in the United Kingdom. Mr. Battah and Mr. Hawe made arrangements to enable Mr. Battah to import United brand cigarettes into the United States. Thus, on their way from NV Sumatra to Mr. Battah, the cigarettes passed through at least these two independent distribution companies.[16]

Because tobacco is a highly regulated business, Mr. Battah was required to comply with a number of regulatory hurdles before importing United brand cigarettes into the United States. NV Sumatra had already obtained United States trademarks for its United brand

---

[16]The record also appears to reveal the existence of an additional intermediary corporation, Orient Pacific, Ltd., based in the United Kingdom.

cigarettes. Mr. Battah's lawyer made arrangements between NV Sumatra and the United States government to ensure that the United brand cigarettes complied with the FTC's requirements for rotating the warnings on cigarette packages. The attorney also took steps to file the required information regarding the cigarettes' ingredients with the Department of Health and Human Services. In a letter dated March 30, 1999, Mr. Battah's lawyer reminded him that he also had to "comply with all state and local laws regarding the sale and distribution of tobacco products," including "any state escrow laws that may be in force."

After taking the steps to ensure that United brand cigarettes could be legally imported into the United States, Mr. Battah began his efforts to cultivate a market for the cigarettes. His goal was to sell 1,000 master cases[17] of United brand cigarettes in each of the fifty states. He created magazine advertisements, assembled a booth with an illuminated United brand logo, and obtained some point-of-sale posters from NV Sumatra. Then he started attending annual tobacco distributor trade shows in Las Vegas where he marketed the cigarettes to smaller regional distributors.[18] Three of the regional distributors that purchased United brand cigarettes from Mr. Battah sold cigarettes in Tennessee.[19]

In May 2001, the United States Customs Service notified FTS that the packaging on the United brand cigarettes was confusing because the cigarettes' Indonesian origin was not conspicuous enough and because the wording on the "American Blend" package, which also featured red and white stripes and a drawing of a flying eagle, appeared to suggest that the cigarettes were made in the United States. Mr. Battah's lawyer was able to convince the Customs Service to grant a waiver for the packages in his inventory that had already been printed. However, the Customs Service insisted that no other United brand cigarettes could be sold in the United States until that packaging was changed.

Undaunted by this development, Mr. Battah sent a sales report to NV Sumatra documenting how many United brand cigarettes he had been selling and where they were being sold. He also included future sales projections and his marketing strategies and requested that NV Sumatra grant him an exclusive distribution agreement in the United States. NV Sumatra's response was not what he had hoped. In a rather impersonal letter dated July 9, 2001, Timin Bingei, NV Sumatra's executive director, stated:

_____

[17]A master case of cigarettes contains 50 cartons of cigarettes. Each carton contains 10 packages, and each package contains 20 cigarettes. Accordingly, a master case contains 10,000 cigarettes.

[18]These regional distributors customarily purchased cigarettes and then sold them to wholesalers who would, in turn, sell the cigarettes to retail outlets such as gas stations and grocery stores.

[19]By 2002, FTS had sold United brand cigarettes to regional distributors who sold cigarettes in Tennessee and fifteen other states.

TO WHOM IT MAY CONCERN

We hereby certify that we are the owner of the "United" trademark registered with the United States Patent and Trademark office in International Class 34 (cigarettes). We have appointed Unico Trading Pte. Ltd. Singapore as our sole agent for sale and marketing cigarettes bearing the trademark "United." We further state that we hereby consent to allow Unico Trading Pte. Ltd. to appoint Silmar Trading Limited, British Virgin Islands to be its exclusive-buyer to distribute "United" cigarettes for sale in the United States of America. This certification remains valid until December 31, 2001 and given above is solely to serve the purpose of importing the products into the United States of America. This certification will not have legal binding [sic] and liabilities to the companies mentioned above or the undersigned.

NV Sumatra Tobacco Trading Company
Timin Bingei – Executive Director

When Mr. Battah was shown this letter during his first deposition, he explained it as follows:

We asked for the exclusive distribution [contract to be put] in writing . . . an agreement to be made between [FTS and NV Sumatra] because we were spending a lot of money on this trademark and on establishing its marketability and wanted to spend a lot more. And they came back with this letter. . . . [W]e were going to expend a lot of energy, time, and money on this product and keep it going . . . . [But] [t]hey wanted us to make our agreements with these other companies . . . .

Mr. Battah and FTS encountered another setback. On July 24, 2001, Mr. Hawe, Silmar's employee in the United Kingdom, sent Mr. Battah a copy of a facsimile he had received from NV Sumatra's International Trade, Sales, and Services Department. The facsimile read:

Your report on the United cigarettes you faxed to us some time ago stated that the said cigarettes can be purchased in California, Washington, Texas, Arizona, Louisiana, Mississippi, Georgia,

South and North Carolina, New Hampshire, Oklahoma, Tennessee, and Kentucky. Most of [the] States mentioned are subject to [the] Escrow Fund Act.

We are wondering whether the importer or any party has opened an escrow account with the States Attorney General. We receive[d] notice from the Office of the Attorney General in the 45 States subject to escrow such as Tennessee, New Hampshire, California, Pennsylvania, etc., to request confirmation whether our cigarettes were sold in their States and whether we have opened an account related to the escrow fund.[20]

The facsimile also noted that these state attorneys general could initiate civil actions to compel compliance with the Escrow Fund Act and seek civil penalties. The facsimile also stated: "Since United cigarettes are imported and distributed in Florida, Miami which is not subject to the requirements of the Escrow Fund, but indirectly distributed to states which require an Escrow Fund, please request FTS to check with their lawyer" on how to respond to the notice.

In order for Mr. Battah to continue selling United brand cigarettes in the United States, he needed NV Sumatra to change the cigarette packages to satisfy the United States Customs Service, and he also needed NV Sumatra either to join the MSA or to open escrow accounts in all the MSA-compliant states in which United brand cigarettes were being sold.[21] Accordingly, Mr. Battah requested representatives of NV Sumatra, Unico, and Silmar to meet him in Miami to address these issues. Mr. Bingei decided that the meeting should be held in Beijing, China instead.

During the meeting in Beijing, Mr. Battah presented information illustrating how many United brand cigarettes were being sold in each state. He also provided the participants with information about the MSA and the state escrow funds statutes. He insisted that the most advantageous path for NV Sumatra would be to begin paying into the various state escrow funds. Once these issues were resolved, Mr. Battah also hoped that NV Sumatra would grant him an exclusive contract to distribute its cigarettes in the United States.

---

[20]The record contains Escrow Fund Act notices sent from the Tennessee Attorney General's office to NV Sumatra, dated March 21 and May 7, 2001, and April 4, 2002.

[21]Based on prior experience, Mr. Battah knew that he would not be permitted to open these escrow accounts himself. He had tried in the past to fund escrow accounts for other imported cigarette brands, but the states had returned the money.

As a result of the Beijing meeting, Mr. Battah believed that the packaging issues would be resolved but was unsure what NV Sumatra's decision regarding the state escrow accounts would be. He hoped for a quick and definitive resolution of these issues because his stock of United brand cigarettes was being rapidly depleted.

Mr. Battah also recalled that one or two additional meetings were held in Miami. It is not clear from the record whether or when these meetings occurred. There is no independent corroboration of these meetings, and Mr. Battah's testimony about these meetings is inconsistent. In his first deposition, Mr. Battah stated that the meeting in Beijing was "the only time [he] met with anyone from NV Sumatra in person," and that no one from NV Sumatra ever came to the United States to meet with him. In an affidavit dated May 26, 2010, NV Sumatra's international sales manager stated that "[NV Sumatra's] corporate records do not reflect any trip to the United States by anyone from [NV Sumatra] during the time period 2001 through 2004." Similarly, Mr. Battah's attorney claimed in his May 26, 2010 affidavit that he possessed "no recollection" and no records of any meeting with representatives from NV Sumatra, Unico, or Silmar in Miami in 2001 or 2002.

Therefore, Mr. Battah's allegation (from his second deposition in February 2010) that NV Sumatra representatives met him in Miami is contradicted by Mr. Battah's own prior testimony, the testimony of his own attorney, and the testimony of NV Sumatra. Although we stated, in *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 644 (Tenn. 2009), that a trial court hearing a Rule 12.02(2) motion "must take as true all the allegations in the plaintiff's complaint and supporting papers, if any, and must resolve all factual disputes in the plaintiff's favor," we also stated that, "in addition to considering the complaint and the supporting or opposing affidavits, the trial court may, in particularly complex cases, allow limited discovery [or] hold an evidentiary hearing." Accordingly, we wish to clarify that a trial court is not obligated to accept as true factual allegations, such as Mr. Battah's illusive Miami meeting, that are controverted by more reliable evidence and plainly lack credibility.[22]

Even if these meetings did take place, they did not work out well for Mr. Battah. In January or February 2002, Mr. Battah received a discouraging telephone call from an NV Sumatra representative. The caller informed Mr. Battah that NV Sumatra had decided not to change the packaging to the United brand cigarettes and that NV Sumatra did not intend to join the MSA or to establish state escrow funds. The caller also informed Mr. Battah that

---

[22]Nor is a court required to accredit an affiant's legal conclusions, such as Mr. Battah's characterizations of the relationships between NV Sumatra and its distribution companies, or Mr. Battah's belief that he had an informal, "oral" distribution agreement that included NV Sumatra as a party. Mr. Battah has not demonstrated that he possesses the expertise necessary to draw conclusions of this sort, and the record contains no documentary or other reliable evidence to support them.

NV Sumatra was withdrawing from the cigarette market in the United States and, therefore, would not enter into an exclusive distribution contract with FTS.

Shortly after this telephone call, FTS sold the last of its inventory of United brand cigarettes. With this venture at an end, Mr. Battah started the American Cigarette Company, which manufactures its own cigarettes. All told, Mr. Battah sold United brand cigarettes in the United States from 1999 to 2002.

**III.**

On June 5, 2003, the State of Tennessee filed suit against NV Sumatra in the Davidson County Chancery Court. The lawsuit alleged that NV Sumatra had failed to deposit funds into a qualified escrow account as required by Tenn. Code Ann. § 47-31-103. The original complaint concerned cigarette sales made in Tennessee in 2000 and 2001, but it was later amended to include sales made in 2002.

According to Tennessee's licensed tobacco distributor reports and the joint stipulation of the parties, a total of 11,592,800 United brand cigarettes were sold in Tennessee from 2000 to 2002. Based on these sales, the State alleged that NV Sumatra was obligated to deposit a total of $168,316.83 into a qualified escrow account. Additionally, the State claimed that NV Sumatra was subject to civil penalties of up to 300% of the unpaid escrow amounts and the State's costs and attorney's fees.

On October 26, 2004, NV Sumatra moved to dismiss the complaint for lack of personal jurisdiction under Tenn. R. Civ. P. 12.02(2). The trial court conducted a hearing, and on September 6, 2006, issued a memorandum opinion denying the motion. At that point, discovery commenced.

The parties deposed Mr. Battah in Fort Lauderdale on October 16, 2008. Mr. Battah explained that he believed he had an oral agreement with NV Sumatra establishing FTS as NV Sumatra's exclusive distributor in the United States. Upon further questioning, however, it became abundantly clear that all of Mr. Battah's agreements were with Silmar or Unico and that NV Sumatra had fastidiously avoided dealing with Mr. Battah directly. NV Sumatra rebuffed Mr. Battah and consistently insisted that he deal with Unico and Silmar instead. Mr. Battah himself testified that

> [NV Sumatra] wanted us to make our agreements with these other companies and we didn't want to make agreements with these other companies. We wanted to make agreements with the trademark owner and the manufacturer of the product

directly. . . . [But] they wanted to run it through these other
companies . . . they wanted to have filters in-between them.

In a similar vein, the record contains an affidavit from NV Sumatra's international sales manager, dated October 25, 2004, stating that NV Sumatra "does not have any contractual relationships with FTS" or any other company that sells NV Sumatra's cigarettes in Tennessee.

At the close of discovery, the parties filed a joint stipulation and cross-motions for summary judgment. Before the hearing on the motions for summary judgment could be held, the State received new information from Mr. Battah. On February 1, 2010, the trial court ordered additional discovery, including a second deposition of Mr. Battah.

During his second deposition on February 23, 2010, Mr. Battah described how he tried to re-establish connections with NV Sumatra in 2004. He sent the company a draft exclusive distribution contract. NV Sumatra returned the draft contract, with Unico substituted as the contracting party. "[A]t this point," Mr. Battah said, "I probably just threw up my hands with these guys, that they just don't get it." Mr. Battah was "pretty upset" by NV Sumatra's "insistence to stick many companies in between" them. In Mr. Battah's mind, Mr. Hawe and Unico were merely brokers. He believed that "[t]he real relationship was between myself and NV Sumatra. They made [the cigarettes], I sold them." In Mr. Battah's opinion, "[e]verybody else in between was smoke screens and mirrors and were unnecessary."

After Mr. Battah's second deposition, the parties filed supplemental briefs in support of their respective motions for summary judgment. The motions were argued on June 9, 2010. On August 18, 2010, the trial court granted NV Sumatra's motion for summary judgment. The trial court held that it had no jurisdiction over the company. The court noted several relevant, uncontested facts:

> The uncontested facts reflect that no Sumatra employee ever traveled to Tennessee for the purpose of conducting business, that no Sumatra employee ever initiated contact with any individual or entity in Tennessee, and that Sumatra does not sell any cigarettes in Tennessee directly or through its agent. Further evident from the uncontested facts is that Sumatra owns a U.S. trademark for the United-brand placed on its cigarette packages and that the ingredient report for the United-brand cigarettes had been filed with the Federal Trade Commission ("FTC") in Washington, D.C. In addition, the parties stipulated that the United-brand cigarettes are labeled with the U.S. Surgeon

-11-

General's warning about the dangers of smoking as required by U.S. law and that the United-brand packaging identifies the product as an American blend.

For purposes of summary judgment only, the State does not dispute that Sumatra does not own or have any interest in UNICO or Silmar Trading nor does Sumatra have any contractual relationship with Silmar Trading permitting or authorizing the sale of United-brand cigarettes in Tennessee. . . . The State does not dispute that Sumatra has no ownership interest in FTS and FTS has no ownership interest in Sumatra. Also undisputed is the acknowledgement by FTS' President, Mr. Battah, that FTS had complete ownership of the United-brand cigarettes purchased from Silmar Trading and that FTS shipped millions of cigarettes to a free-trade zone in Miami, Florida.

The trial court also noted that its jurisdiction over NV Sumatra was limited by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. After analyzing the substance of this Due Process restriction on its power, the court concluded:

Tennessee courts have analyzed the Due Process Clause to require something more than that the defendant was aware of its product's entry into Tennessee through the stream of commerce in order to exert jurisdiction over the defendant. In this light, the Court requires some evidence that Sumatra did something more purposefully directed at Tennessee than the mere act of placing cigarettes into the stream of commerce. Absent such proof, the Court cannot exercise specific personal jurisdiction over Sumatra.

The State perfected an appeal to the Court of Appeals. In an opinion handed down on June 28, 2011, the Court of Appeals reversed the trial court and remanded the case with directions to enter a summary judgment for the State. *State ex rel. Cooper v. NV Sumatra Tobacco Trading Co.*, No. M2010-01955-COA-R3-CV, 2011 WL 2571851, at *32 (Tenn. Ct. App. June 28, 2011). Disagreeing with the trial court's assessment of NV Sumatra's contacts with Tennessee, the court found that "the manufacturer intentionally used a distribution system with the desired result of selling its product in all fifty states, including Tennessee, so as to support a finding that the manufacturer had minimum contacts with the State necessary to invoke the exercise of personal jurisdiction." *State ex rel. Cooper v. NV Sumatra*, 2011 WL 2571851, at *1. The court then made a policy argument that "[f]oreign

-12-

manufacturers should not be allowed to insulate themselves by using intermediaries in a chain of distribution or by professing ignorance of the ultimate destination of their products." To allow a foreign manufacturer to "shield itself from liability" through the use of "middlemen" would permit "a legal technicality to subvert justice and economic reality." *State ex rel. Cooper v. NV Sumatra.*, 2011 WL 2571851, at *15 (quoting *Certisimo v. Heidelberg Co.*, 298 A.2d 298, 304 (N.J. Super. 1972)). Finally, the court stated that "the stream-of-commerce theory supports personal jurisdiction over foreign manufacturers" like NV Sumatra that "derive benefits from the distribution and sale of their products in the United States." *State ex rel. Cooper v. NV Sumatra*, 2011 WL 2571851, at *15.[23]

The day before the Court of Appeals released its decision, the United States Supreme Court published its first ruling on personal jurisdiction in twenty-four years. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. ___, 131 S. Ct. 2780 (2011). In *J. McIntyre Machinery*, the Court found that New Jersey lacked personal jurisdiction over a British manufacturer that sold an allegedly defective scrap metal processing machine to a New Jersey company through an independent Ohio-based distributor. On July 8, 2011, NV Sumatra filed a petition seeking a rehearing of its case before the Court of Appeals. *State ex rel. Cooper v. NV Sumatra*, 2011 WL 2571851, at *32. NV Sumatra took issue with several of the appellate court's factual findings and argued that the court's decision was inconsistent with the United States Supreme Court's *J. McIntyre Machinery* decision.

On August 24, 2011, the Court of Appeals denied NV Sumatra's petition for a rehearing. The Court of Appeals distinguished *J. McIntyre Machinery* on its facts. The court noted that this case did not involve "an isolated defective product that found its way into the forum state through the stream of commerce." *State ex rel. Cooper v. NV Sumatra*, 2011 WL 2571851, at *33. Instead, the court emphasized that "the number of Sumatra's United brand cigarettes sold in Tennessee constitutes something more than an isolated event" and, "[NV] Sumatra's contacts with Tennessee were [therefore] neither isolated, nor incidental." *State ex rel. Cooper v. NV Sumatra*, 2011 WL 2571851, at *33. Accordingly, the court held that the sales of NV Sumatra's cigarettes arose from "the efforts of the manufacturer or distributor to serve directly or indirectly the market for its product in other States." Thus, NV Sumatra's "efforts to distribute its product throughout the United States" made it "not unreasonable" to subject NV Sumatra to suit in Tennessee. *State ex rel. Cooper v. NV Sumatra*, 2011 WL 2571851, at *34 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). We granted NV Sumatra's application for permission to appeal.

---

[23]The Court of Appeals also addressed the questions of whether the Escrow Fund Act was constitutional and whether the Act properly applied to NV Sumatra. Because we find that Tennessee courts lack jurisdiction to hear this case, we need not address these issues.

**IV.**

Before addressing the substantive issues relating to the ability of Tennessee's courts to exercise personal jurisdiction over NV Sumatra under the facts of this case, we first attend to a procedural matter. NV Sumatra originally invoked Tenn. R. Civ. P. 12.02(2) when it requested the trial court to dismiss the State's complaint for lack of personal jurisdiction. The trial court denied the motion, but later NV Sumatra renewed its challenge to personal jurisdiction using a Tenn. R. Civ. P. 56 motion. Because the parties stipulated the facts, the trial court treated the question of personal jurisdiction as a question of law and dismissed the complaint. Because the trial court had considered the proceeding as one for summary judgment, the Court of Appeals did the same. *State ex rel. Cooper v. NV Sumatra*, 2011 WL 2571851, at *7-9.

Courts should give effect to the substance of motions rather than their form or title. *See Brundage v. Cumberland Cnty.*, 357 S.W.3d 361, 371 (Tenn. 2011); *Abshure v. Methodist Healthcare-Memphis Hosps.*, 325 S.W.3d 98, 104 (Tenn. 2010); *Norton v. Everhart*, 895 S.W.2d 317, 319 (Tenn. 1995). Accordingly, the trial court should have followed the procedures applicable to the hearing and disposition of Tenn. R. Civ. P. 12.02(2) motions challenging personal jurisdiction rather than the procedures commonly associated with motions for summary judgment.

In a recent case involving general personal jurisdiction over a non-resident defendant, we held that a defendant's "motion for summary judgment based on lack of personal jurisdiction" should have been decided as a Rule 12.02(2) motion to dismiss for lack of jurisdiction rather than a motion for summary judgment. *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d at 642. We explained that either challenging or opposing a Tenn. R. Civ. P. 12.02(2) motion using facts beyond the pleadings does not convert the motion into a motion for summary judgment as in the case of a Tenn. R. Civ. P. 12.02(6) motion. *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d at 643 (citing *Chenault v. Walker*, 36 S.W.3d 45, 55 (Tenn. 2001); *Tennessee Farmers Mut. Ins. Co. v. Farmer*, 970 S.W.2d 453, 455 (Tenn. 1998); *Bemis Co. v. Hines*, 585 S.W.2d 574, 576 (Tenn. 1979); Tenn. R. Civ. P. 1 (reflecting a policy favoring the "just, speedy, and inexpensive determination of every action")).

A Tenn. R. Civ. P. 12.02(2) motion to dismiss for lack of personal jurisdiction, which challenges the trial court's authority to hear the case, is ideally addressed as a threshold issue. Thus, a defendant may file a Tenn. R. Civ. P. 12.02(2) motion prior to filing its answer or may include the defense in its answer. The defendant may, at its discretion, support the motion with affidavits or other evidentiary materials. The plaintiff then bears the burden of making a prima facie showing of personal jurisdiction, based on its own evidence. When weighing the evidence on a Tenn. R. Civ. P. 12.02(2) motion, the trial court must take all

-14-

factual allegations in the plaintiff's complaint and supporting papers as true. The court must resolve all factual disputes in the plaintiff's favor. In complex cases, the court may allow limited discovery and hold an evidentiary hearing. The court may even hold the motion in abeyance until after a trial. *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d at 644.

In this case, the parties and the courts below focused on whether any "genuine issue as to any material fact" existed and whether either moving party was "entitled to judgment as a matter of law." *State ex rel. Cooper v. NV Sumatra*, 2011 WL 2571851, at *8-9, *28-29. Instead, under the rule expressed in *Gordon v. Greenview Hosp., Inc.*, the proper question in this case is whether, taking the State's factual allegations as true and resolving all reasonably disputed facts in the State's favor, the State has shown, by a preponderance of the evidence, that Tennessee courts may properly exercise jurisdiction over NV Sumatra.

## V.

This case invokes two thorny issues regarding personal jurisdiction. The first issue is whether a foreign manufacturer may be subject to a state court's jurisdiction when that manufacturer's product arrives in the forum state through a series of independent intermediaries not under the manufacturer's control. The second issue is whether a foreign manufacturer who has targeted the United States market as a whole can be subject to personal jurisdiction in a state where the manufacturer's products have been sold, when the evidence fails to show that the manufacturer specifically targeted the forum state.

Issues regarding personal jurisdiction in cases such as this implicate the Due Process Clause of the Fourteenth Amendment. Accordingly, the decisions of the United States Supreme Court establish the boundary lines of personal jurisdiction. While the United States Supreme Court's two most recent decisions in this area have produced inconsistent rationales, we can glean from them the principles that enable us to construe and apply our long-arm statutes in a constitutional manner. Even though there may be cases in which it would be permissible to assert personal jurisdiction over a foreign manufacturer whose products reach Tennessee through a series of independent distributors, this is not one of those cases.

Our discussion will begin with Tennessee's long-arm statutes. Because these statutes derive their content from the United States Constitution, our analysis will include a consideration of the relevant precedents of the United States Supreme Court, particularly *J. McIntyre Machinery*. We will also consider the relevant Tennessee case law and then determine whether the decision in *J. McIntyre Machinery* signals a change in the law. Finally, we will address the facts of this case and render a decision.

## A.

In 1972, the Tennessee General Assembly amended the long-arm statute to expand its jurisdictional reach as far as constitutionally permissible.[24] Thus, Tenn. Code Ann. § 20-2-214(a)(6) now states that "[p]ersons who are nonresidents of this state . . . are subject to the jurisdiction of the courts of this state as to any action or claim for relief arising from," among other things, "[a]ny basis not inconsistent with the constitution of this state or of the United States." We have observed that this amendment "converted the long-arm statute from a 'single enumerated act' statute to a 'minimum contacts' statute that permitted Tennessee courts to exercise personal jurisdiction over nonresident defendants to the full limit permitted by due process." *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d at 645 (citing *Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn. 1985)); *see also Shelby Mut. Ins. Co. v. Moore*, 645 S.W.2d 242, 245-46 (Tenn. Ct. App. 1981).

Some in the legal community expressed concern that the precise wording of Tenn. Code Ann. § 20-2-214(a)(6) did not actually stretch Tennessee's jurisdictional arm quite as long as the General Assembly intended. *See Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d at 645-46 (citing Robert Banks, Jr., *The Future of General Jurisdiction in Tennessee*, 27 U. Mem. L. Rev. 559, 581-82 (1997)). Accordingly, the General Assembly engrafted another long-arm in 1997.[25] Tenn. Code Ann. § 20-2-225 provides that "[a] court of this state may exercise jurisdiction: (1) [o]n any other basis authorized by law; or (2) [o]n any basis not inconsistent with the constitution of this state or of the United States."[26]

Both of Tennessee's long-arm statutes, then, derive their scope from the Tennessee and Federal Constitutions. In this context, we have interpreted the due process protections in the Constitution of Tennessee as being co-extensive with those of the United States Constitution. *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d at 646 (citing *Gallaher v. Elam*, 104 S.W.3d 455, 463 (Tenn. 2003); *Newton v. Cox*, 878 S.W.2d 105, 110 (Tenn. 1994)). Therefore, the reach of Tennessee's long-arm statutes cannot extend beyond the limits set by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

---

[24]Act of Apr. 4, 1972, ch. 689, 1972 Tenn. Pub. Acts 688, 688-89 (codified as amended at Tenn. Code Ann. § 20-2-214 (2009)).

[25]Act of May 1, 1997, ch. 226, 1997 Tenn. Pub. Acts 366, 367 (codified at Tenn. Code Ann. § 20-2-225 (2009)).

[26]Tennessee has a third, vestigial "long-arm" statute found at Tenn. Code Ann. § 20-2-223 (2009). This statute is narrower in scope than Tenn. Code Ann. §§ 20-2-214, -225 and has largely fallen into disuse.

**B.**

The United States Supreme Court's seminal modern personal jurisdiction case is *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). In *International Shoe*, the Court was tasked with deciding whether a Delaware shoe manufacturer could be sued in the State of Washington for unpaid contributions to that state's unemployment compensation fund. The company employed eleven to thirteen salespersons who lived and worked in Washington and these employees were under "direct supervision and control of sales managers located in St. Louis." The employees were provided sample inventory and occasionally rented permanent or temporary locations in Washington to showcase their wares. The shoe company itself had no office in the state and kept no stock of merchandise for sale there. *International Shoe*, 326 U.S. at 313-14.

The Washington Supreme Court held that the company's "regular and systematic solicitation of orders" through its salespersons, and the "continuous flow of [International Shoe's] product into the state" made the company amenable to suit in Washington's courts. *International Shoe*, 326 U.S. at 314. The United States Supreme Court agreed, and noted that, "[h]istorically the jurisdiction of courts to render judgment in personam is grounded on their de facto power over the defendant's person." Accordingly, the defendant's physical "presence within the territorial jurisdiction of [the] court" had previously been a prerequisite to the court's authority to bind the defendant. *International Shoe*, 326 U.S. at 316. However, in the wake of *Pennoyer v. Neff*, 95 U.S. 714 (1877), and other changes in civil procedure, the Court noted that a new rule had emerged:

> [D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*International Shoe*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). This "minimum contacts" language has been the crux of personal jurisdiction in America ever since *International Shoe* was decided.

The Court explained that this "minimum contacts" language is actually a way of analogizing physical presence in cases that involve not a physical person, but an abstract entity like a corporation:

> Since the corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact, it is clear that

-17-

> [a corporation's presence in the forum state] can be manifested only by activities carried on in its behalf by those who are authorized to act for it. . . .  For the terms "present" or "presence" are used merely to symbolize those activities of the corporation's agent within the state which courts will deem to be sufficient to satisfy the demands of due process.

*International Shoe*, 326 U.S. at 316-17 (internal citations omitted).  The Court explained that a corporation's "continuous and systematic" activities within a forum give rise to the corporation's legal or metaphorical "presence" in that state.  However, a corporate agent's "casual presence" or "his conduct of single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there." *International Shoe*, 326 U.S. at 317.

The Court also explained that "the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative." *International Shoe*, 326 U.S. at 319.  Instead, "[w]hether due process is satisfied must depend rather upon the quality and nature" of the corporation's activities. *International Shoe*, 326 U.S. at 319.  The Due Process Clause "does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations." *International Shoe*, 326 U.S. at 319.  However,

> to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state.  The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*International Shoe*, 326 U.S. at 319.

The United States Supreme Court later explained that the concept of minimum contacts performs two related functions.  First, "[i]t protects the defendant against the burdens of litigating in a distant or inconvenient forum," and second, "it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980).

The minimum contacts inquiry is generally forum-specific and based on fairness to the defendant. In *World-Wide Volkswagen*, the United States Supreme Court noted that "[t]he limits imposed on state jurisdiction by the Due Process Clause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years." This trend, the Court said, "is largely attributable to a fundamental transformation in the American economy." *World-Wide Volkswagen*, 444 U.S. at 292-93. Although commerce has become an increasingly interstate and international affair, the Court said, "we have never accepted the proposition that state lines are irrelevant for jurisdictional purposes, nor could we, and remain faithful to the principles of interstate federalism embodied in the Constitution." *World-Wide Volkswagen*, 444 U.S. at 293.

In light of our nation's federalist structure and its commitment to procedural fairness, a state may not make binding judgments against a defendant that has "no contacts, ties or relations" with the state. *World-Wide Volkswagen*, 444 U.S. at 294 (citing *International Shoe*, 326 U.S. at 319). This is true, the Court said, "[e]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State[,] even if the forum State has a strong interest in applying its law to the controversy[,]" and "even if the forum State is the most convenient location for litigation." Even then, "the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment." *World-Wide Volkswagen*, 444 U.S. at 294 (quoting *Hanson v. Denckla*, 357 U.S. 235, 251, 254 (1958)).

*World-Wide Volkswagen* involved a products liability suit in Oklahoma. The Robinson family bought a new Audi automobile in New York. They later moved to Arizona. On the way to Arizona, the Audi crashed in Oklahoma and burst into flames, severely burning the mother and two children. They filed a products liability suit in an Oklahoma state court. Among the defendants were the New York car dealership and Seaway, Audi's regional distributor for New York. The plaintiffs argued that, because of the inherent mobility of an automobile, it was "foreseeable" to the defendants that the Robinsons' Audi could cause injury in Oklahoma. *World-Wide Volkswagen*, 444 U.S. at 288, 295.

The United States Supreme Court declined to adopt this "foreseeability" rationale. "[F]oreseeability alone," the Court said, "has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen*, 444 U.S. at 295. If the Court adopted the plaintiff's theory, then "[e]very seller of chattels would in effect appoint the chattel his agent for service of process. His amenability to suit would travel with the chattel." *World-Wide Volkswagen*, 444 U.S. at 296. While foreseeabilty, the Court said, remained relevant to the analysis,

the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.

*World-Wide Volkswagen*, 444 U.S. at 297.

According to the Court, the Due Process analysis functioned to provide "a degree of predictability to the legal system that allows potential defendants to structure their conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen*, 444 U.S. at 297. Thus,

[w]hen a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but *arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States*, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that *delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.*

*World-Wide Volkswagen*, 444 U.S. at 297-98 (emphasis added) (quoting *Hanson v. Denckla*, 357 U.S. at 253).

The emphasized statements in the above quotation have sometimes been taken out-of-context and misapplied. The quotation above, taken as a whole, makes clear that the defendant corporation's relevant "expectation" arises from the company's purposeful availment of the forum state. The "expectation" is what arises from the company's "efforts" to serve the forum state's market. And these "efforts" involve "conduct and connection[s]"

with the forum state. "Expectation" in the personal jurisdiction context is not mere foreseeability.

In *World-Wide Volkswagen*, because neither the distributor nor the dealership made "efforts" to serve the market in Oklahoma, they had no "expectation" that their cars would render them liable to suit there. Although it was literally foreseeable that the cars would eventually drive through Oklahoma and possibly crash, "the mere 'unilateral activity'" of the consumer in bringing the product into Oklahoma could not be construed as a "contact" of the defendant with the forum state. *World-Wide Volkswagen*, 444 U.S. at 298 (quoting *Hanson v. Denckla*, 357 U.S. at 253).

One important development in the doctrine of personal jurisdiction has been the distinction between general and specific personal jurisdiction. The United States Supreme Court recognized this distinction in *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & nn.8, 9 (1984), and this Court did the same in *J.I. Case Corp. v. Williams*, 832 S.W.2d 530, 532 (Tenn. 1992), *overruled in part by Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d at 649 n.11. Specific jurisdiction exists when a defendant has minimum contacts with the forum state and the cause of action arises out of those contacts. General jurisdiction, on the other hand, may be proper even when the cause of action does not arise out of the defendant's activities in the forum state. A state's courts may assert general jurisdiction when the defendant is "essentially at home" in the state. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. ___, ___, 131 S. Ct. 2846, 2851 (2011). Being essentially at home means that a nonresident defendant's contacts with the forum state are "sufficiently continuous and systematic" such that it would be fair to subject the defendant to suit in the forum state, even when the cause of action arises elsewhere. *Goodyear v. Brown*, 131 S. Ct. at 2854; *see also Helicopteros Nacionales*, 466 U.S. at 414-16; *Gordon v. Greenview Hosp., Inc*, 300 S.W.3d at 648-49. Because the parties agree that the State's lawsuit against NV Sumatra implicates specific jurisdiction rather than general jurisdiction, our analysis will focus on specific jurisdiction.

In *Burger King Corp. v. Rudzewicz*, the United States Supreme Court explained that a forum state "legitimately may exercise personal jurisdiction over a nonresident who 'purposefully directs' its activities toward forum residents" because a state has a "manifest interest" in giving its residents "a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (quoting *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957)). "Moreover," the Court said, when defendants have "purposefully derive[d] benefit" from their interstate activities, "it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities." *Burger King*, 471 U.S. at 473-74

(quoting *Kulko v. California Superior Court,* 436 U.S. 84, 96 (1978)).  The Court explained that

> [t]his "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or a third person." Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State.  Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King*, 471 U.S. at 475-76 (internal citations omitted).

Two years after *Burger King*, the United States Supreme Court decided *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102 (1987), which complicated the specific personal jurisdiction analysis.  *Asahi* involved a fatal motorcycle accident.  The driver filed suit in a California state court, alleging that a defect in the motorcycle's rear tire caused the accident.  Among the defendants was the Taiwanese company that had manufactured the tire's inner tube.  The inner tube manufacturer sued Asahi Metal Industry Company, the Japanese manufacturer of the inner tube's valve stem, seeking indemnification.  The parties eventually settled all claims except the Taiwanese company's indemnification claim against Asahi.  *Asahi*, 480 U.S. at 105-06.

The United States Supreme Court unanimously held that the California state courts could not assert personal jurisdiction over Asahi.  However, the plurality opinion's minimum contacts analysis garnered only four votes; while three justices joined Justice Brennan in advocating a more expansive minimum contacts test.  Justice Stevens would have avoided the minimum contacts analysis altogether because, in his view, the case could have been decided purely on fairness grounds.

The Court defined the controlling question as

whether the mere awareness on the part of a foreign defendant
that the components it manufactured, sold, and delivered outside
the United States would reach the forum State in the stream of
commerce constitutes "minimum contacts" between the
defendant and the forum State such that the exercise of
jurisdiction "does not offend 'traditional notions of fair play and
substantial justice.'"

*Asahi*, 480 U.S. at 105 (quoting *International Shoe*, 326 U.S. at 316).

The California Superior Court found jurisdiction to be proper, stating that "Asahi
obviously does business on an international scale. It is not unreasonable that they defend
claims of defect in their product on an international scale." *Asahi*, 480 U.S. at 107. The
Supreme Court of California likewise held that Asahi's intentional act of placing its
components into the stream of commerce together with the company's awareness that some
of the components would eventually find their way into California satisfied due process
requirements for jurisdiction under *World-Wide Volkswagen*. *Asahi*, 480 U.S. at 108.

The United States Supreme Court disagreed. Justice O'Connor's plurality opinion
cited "the oft-quoted reasoning" that

minimum contacts must have a basis in 'some act by which the
defendant purposefully avails itself of the privilege of
conducting activities within the forum State, thus invoking the
benefits and protections of its laws. . . . Jurisdiction is proper .
. . where the contacts proximately result from actions by the
defendant *himself* that create a 'substantial connection' with the
forum state.

*Asahi*, 480 U.S. at 109 (quoting *Burger King*, 471 U.S. at 475).

After noting that minimum contacts must be based on an act of the defendant, the
plurality opinion reiterated that the "concept of foreseeability" is "an insufficient basis for
jurisdiction under the Due Process Clause." *Asahi*, 480 U.S. at 109 (citing *World-Wide
Volkswagen*, 444 U.S. at 295-96). To establish minimum contacts, there must be a
"substantial connection" between the defendant and the forum state. And this connection
"must come about by *an action of the defendant purposefully directed toward the forum
state*." *Asahi*, 480 U.S. at 112 (citing *Burger King*, 471 U.S. at 475-76). Thus, Justice
O'Connor's plurality opinion concluded that "[t]he placement of a product into the stream

-23-

of commerce, without more, is not an act of the defendant purposefully directed toward the forum state." *Asahi*, 480 U.S. at 112.

Justice O'Connor's mode of analysis in *Asahi* has come to be known as the "stream of commerce plus" doctrine.[27] It provides a conceptual framework for determining whether minimum contacts exist in a products liability case involving a nonresident defendant. Justice O'Connor's plurality opinion includes some examples of "[a]dditional conduct" that could provide the "something more," beyond merely selling an item, necessary to demonstrate "purposeful availment" of the forum state. These include

> designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. *But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.*

*Asahi*, 480 U.S. at 112 (emphasis added).

Justice Brennan, joined by three other justices, disagreed, stating:

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. . . . A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity.

---

[27]See 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1067.1, at 461 (3d ed. 2002); Robin J. Effron, *Letting the Perfect Become the Enemy of the Good: The Relatedness Problem in Personal Jurisdiction*, 16 Lewis & Clark L. Rev. 867, 878-80 (2012) ("Effron"); Leading Cases, 125 Harv. L. Rev. 311, 312-14 (2011).

*Asahi*, 480 U.S at 117 (Brennan, J., concurring in part). In Justice Brennan's view, a manufacturer's awareness that the product would be sold in the forum state established minimum contacts.

The Court then fell silent on specific personal jurisdiction from 1987 to 2011. When the Court spoke again in *J. McIntyre Machinery, Ltd. v. Nicastro*, its opinion did little to resolve the lingering questions left by *Asahi*. The *J. McIntyre Machinery* plurality opinion, authored by Justice Kennedy and joined by three other justices, found that the New Jersey courts lacked jurisdiction over a British manufacturer of metal shearing machines. In a dissenting opinion, Justice Ginsburg, joined by two other justices, decided that jurisdiction was proper under a somewhat broader version of the stream of commerce theory. In a concurring opinion, Justice Breyer, joined by Justice Alito, agreed with the plurality's result but took issue with Justice Kennedy's reasoning and with Justice Ginsburg's characterization of the facts.

The facts of *J. McIntyre Machinery* are as follows. J. McIntyre Machinery, Ltd. ("McIntyre UK") manufactures metal shearing machines in Nottingham, England. McIntyre Machinery America, Ltd. ("McIntyre America"), located in Stow, Ohio, was its exclusive distributor in the United States. One of McIntyre UK's shearing machines was purchased by Curcio Scrap Metal in Saddle Brook, New Jersey.

In October 2011, Robert Nicastro, an employee of Curico Scrap Metal, seriously injured his hand while operating the metal shearing machine at his employer's place of business. He filed a products liability action against McIntyre UK and McIntyre America in the New Jersey courts. The trial court dismissed Mr. Nicastro's lawsuit against McIntyre UK for lack of personal jurisdiction. The Superior Court of New Jersey, Appellate Division, reversed, *Nicastro v. McIntyre Mach. Am., Ltd.*, 945 A.2d 92 (N.J. Super. Ct. App. Div. 2008), and the New Jersey Supreme Court affirmed the Appellate Division's finding that exercising jurisdiction over the manufacturer comported with due process. *Nicastro v. McIntyre Mach. Am., Ltd.*, 987 A.2d 575 (N.J. 2010).

The facts before the New Jersey courts were that McIntyre UK and McIntyre America were independent companies. McIntyre UK held United States patents on its machines, and McIntyre America acted under the "direction and guidance" of McIntyre UK. McIntyre UK encouraged McIntyre America to sell its machines in the United States, and representatives of McIntyre UK attended annual trade conventions in the United States to promote their machines. Representatives of McIntyre UK actually installed machines at scrap metal processing companies in several states. The machine that injured Mr. Nicastro had been assembled in Great Britain and shipped to McIntyre America. In turn, McIntyre America had

shipped the machine to Curico Scrap Metal in New Jersey. *Nicastro v. McIntyre Mach. Am., Ltd.*, 987 A.2d at 578-79.

It was apparent from the facts that McIntyre UK had purposefully availed itself of the United States market. The key question before the United States Supreme Court was whether McIntyre UK's efforts to target the United States market triggered jurisdiction in New Jersey when only one machine – or possibly up to four machines – had been sold in that state.

The Supreme Court of New Jersey held that targeting the United States market was sufficient to trigger jurisdiction in any state in which McIntyre UK's products were sold. The court held that jurisdiction exists when the manufacturer "knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states." Because McIntyre UK "knew or reasonably should have known" that its products might reach New Jersey and took no "reasonable step to prevent the distribution of its products" in that state, jurisdiction was held to be proper. *Nicastro v. McIntyre Mach. Am., Ltd.*, 987 A.2d at 592-93. Significantly, the Supreme Court of New Jersey did "not find that [McIntyre UK] had a presence or minimum contacts in this State – in any jurisprudential sense – that would justify a New Jersey court to exercise jurisdiction in this case." Rather, Mr. Nicastro's "claim that [McIntyre UK] may be sued in this State must sink or swim with the stream-of-commerce theory of jurisdiction." *Nicastro v. McIntyre Mach. Am., Ltd.*, 987 A.2d at 582.

Justice Kennedy's four-justice plurality opinion expressed concern that the Supreme Court of New Jersey was too swept up in "the 'stream of commerce' metaphor." Justice Kennedy reiterated that the "general rule" that "the exercise of judicial power is not lawful unless the defendant 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws,'" was applicable to product liability suits like Mr. Nicastro's. *J. McIntyre Mach.*, 131 S. Ct. at 2785 (quoting *Hanson v. Denckla*, 357 U.S. at 253).

Accordingly, Justice Kennedy framed the jurisdictional analysis in terms of how a defendant "submits" to the "power" of a "sovereign" through "contact with and activity directed at" that particular sovereign. *J. McIntyre Mach.*, 131 S. Ct. at 2788. To establish specific personal jurisdiction, the defendant must "'seek to serve' a given state's market." *J. McIntyre Mach.*, 131 S. Ct. at 2788 (quoting *World-Wide Volkswagen*, 444 U.S. at 295). Thus, "[t]he principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign." This happens when the defendant purposefully avails itself of the privilege of conducting activities within the sovereign's territory. A defendant can sometimes do this "by sending its goods rather than its agents." But the transmission of goods only triggers jurisdiction when the defendant has

-26-

"targeted the forum." Generally, "it is not enough that the defendant might have predicted that its goods will reach the forum State." *J. McIntyre Mach.*, 131 S. Ct. at 2788.

Justice Kennedy criticized Justice Brennan's concurring opinion in *Asahi* for "discard[ing] the central concept of sovereign authority in favor of considerations of fairness and foreseeability." *J. McIntyre Mach.*, 131 S. Ct. at 2788. He pointed out that Justice Brennan's "stream of commerce" approach "made foreseeability the touchstone of jurisdiction." *J. McIntyre Mach.*, 131 S. Ct. at 2788. Parting ways with Justice Brennan, Justice Kennedy explained that "jurisdiction is in the first instance a question of authority rather than fairness" and that "[t]his Court's precedents make clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *J. McIntyre Mach.*, 131 S. Ct. at 2789. Accordingly, Justice Kennedy's analysis of the relevant precedents led him to conclude that

> personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis. The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct. . . . Because the United States is a distinct sovereign, a defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State.

*J. McIntyre Mach.*, 131 S. Ct. at 2789.

Under the plurality opinion's framework, McIntyre UK's only relevant contacts were its "purposeful contacts with New Jersey, not with the United States." *J. McIntyre Mach.,* 131 S. Ct. at 2790. According to Justice Kennedy, the minimum contacts analysis centered on three facts: "The distributor agreed to sell J. McIntyre's machines in the United States; J. McIntyre officials attended trade shows in several States but not in New Jersey; and up to four machines ended up in New Jersey." *J. McIntyre Mach.*, 131 S. Ct. at 2790. "Indeed," he noted, "after discovery the trial court found that the 'defendant does not have a single contact with New Jersey short of the machine in question ending up in this state.'" While these facts might have revealed an intent to serve the United States market, they did not show that McIntyre UK purposefully availed itself of the New Jersey market. *J. McIntyre Mach.*, 131 S. Ct. at 2790. Under these facts, then, New Jersey was "without power to adjudge the rights and liabilities of J. McIntyre, and its exercise of jurisdiction would violate due process." *J. McIntyre Mach.*, 131 S. Ct. at 2791.

Justice Breyer's concurring opinion took issue with the plurality opinion's approach. Justice Breyer noted that there have been "many recent changes in commerce and communication, many of which are not anticipated by our precedents." *J. McIntyre Mach.*, 131 S. Ct. at 2791 (Breyer, J., concurring). However, Justice Breyer thought it "unwise" at that time "to announce a new rule of broad applicability." Justice Breyer preferred to delay formulating new rules in this case because its outcome could be determined with existing precedents. *J. McIntyre Mach.*, 131 S. Ct. at 2791. Accordingly, he concluded that "[n]one of our precedents finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient" to confer jurisdiction. *J. McIntyre Mach.*, 131 S. Ct. at 2792 (Breyer, J., concurring).

In dissent, Justice Ginsburg chided the "splintered majority" for "turn[ing] the clock back to the days before modern long-arm statutes when a manufacturer, to avoid being haled into court where a user is injured, need only Pilate-like wash its hands of a product by having independent distributors market it." *J. McIntyre Mach.*, 131 S. Ct. at 2795 (Ginsburg, J., dissenting) (quoting Russell J. Weintraub, *A Map Out of the Personal Jurisdiction Labyrinth*, 28 U.C. Davis L. Rev. 531, 555 (1995)). While acknowledging that McIntyre America was fully independent from McIntyre UK, Justice Ginsburg observed that the machine that injured Mr. Nicastro had arrived in New Jersey "not randomly or fortuitously, but as a result of the U.S. connections and distribution system that McIntyre UK deliberately arranged." *J. McIntyre Mach.*, 131 S. Ct. at 2797 (Ginsburg, J., dissenting).

Unlike the majority opinions, which condensed the record down to three essential facts, Justice Ginsburg exhaustively documented McIntyre UK's marketing efforts toward the United States, as well as its close working relationship with its American distributor. She determined that permitting New Jersey's courts to assert jurisdiction over McIntyre UK was fair and reasonable, especially in light of New Jersey's status as the largest market for scrap metal processing in the United States. Justice Ginsburg asked rhetorically, "[h]ow could McIntyre UK not have intended, by its actions targeting a national market, to sell products in [New Jersey,] the fourth largest destination for imports among all States in the United States and the largest scrap metal market?" *J. McIntyre Mach.*, 131 S. Ct. at 2801 (Ginsburg, J., dissenting). Because McIntyre UK had "purposefully availed itself" of "the United States market nationwide," Justice Ginsburg concluded it "thereby availed itself of the market of all States in which its products were sold by its exclusive distributor." *J. McIntyre Mach.*,

131 S. Ct. at 2801 (Ginsburg, J., dissenting).[28] We will return to the *J. McIntyre Machinery* opinion shortly.

The foregoing survey of United States Supreme Court's decisions reveals a pattern of key phrases and concepts that serve as guideposts marking the constitutional boundaries of specific personal jurisdiction. Although "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum State," *Burger King*, 471 U.S. at 474, certain other phrases appear again and again. These include "meaningful contacts, ties, or relations," "actions by the defendant himself that create a substantial connection," "fair warning," "clear notice," "purposeful availment," "targeting" the forum, "not random, fortuitous, or attenuated contacts," not the "unilateral activity of another party or a third person," "predictability to the legal system that allows potential defendants to structure their primary conduct" to know where they will be liable to suit, and "foreseeability," meaning that the defendant "should reasonably anticipate being haled into court" in the forum state. Jurisdiction can be established by "purposefully direct[ing]" activities at residents of the forum, "deliver[ing] products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state," "purposefully deriv[ing] benefit" from the forum state, "deliberately" engaging in "significant activities" within the forum state, creating "continuing obligations" with residents of the forum state, and invoking the "benefits and protections" of the forum state's laws. Also, it is perfectly clear that placing a product into the stream of commerce, "without more," is not an act "purposefully directed" at the forum state, and "awareness" of where a product will end up is not purposeful direction. All of these guideposts remain standing after the United States Supreme Court's *J. McIntyre Machinery* decision.

## C.

Personal jurisdiction cases in Tennessee have generally hewn closely to the United States Supreme Court's precedents. In *Masada Inv. Corp. v. Allen*, this Court observed that due process only permits personal jurisdiction over a non-resident when the defendant

> has minimum contacts with the forum such that "the
> maintenance of the suit does not offend 'traditional notions of

---

[28]Justice Ginsburg distinguished *Asahi* by noting that "Asahi, unlike McIntyre UK, did not itself seek out customers in the United States." Unlike McIntyre UK, which made large industrial machines and targeted the American market, "Asahi was a component-part manufacturer with 'little control over the final destination of its products once they were delivered into the stream of commerce.'" *J. McIntyre Mach.*, 131 S. Ct. at 2803 (Ginsburg, J., dissenting) (quoting *A. Uberti & C. v. Leonardo,* 892 P.2d 1354, 1361 (Ariz. 1995)).

fair play and substantial justice.'" However, the absence of physical contacts will not defeat *in personam* jurisdiction where a commercial actor purposefully directs his activities toward citizens of the forum State and litigation results from injuries arising out of or relating to those activities. In such a case, "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."

*Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn. 1985) (internal citations omitted) (finding jurisdiction proper over a defendant who "purposely availed himself of the privilege of doing business within this state" when he "purposefully directed his activities toward the citizens of this state and his negligent actions resulted in injury here"). We held that, in performing this "minimum contacts" analysis, there are three primary and two secondary factors to consider. The three primary factors are "the quantity of the contacts, their nature and quality, and the source and connection of the cause of action with those contacts." The two lesser factors are "the interest of the forum State and convenience." *Masada Inv. Corp. v. Allen*, 697 S.W.2d at 334 (citing *Shelby Mut. Ins. Co. v. Moore*, 645 S.W.2d 242, 245 (Tenn. Ct. App. 1981)).

Although some Tennessee courts continue to use *Masada*'s five-factor framework, this Court and several Court of Appeals panels soon began using the United States Supreme Court's two-part test described in *Burger King*, 471 U.S. 462, 476-77 (1985). *See Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 646-47 (Tenn. 2009); *Franklin American Mortg. v. Dream House Mortg. Corp.*, No. M2009-01956-COA-R9-CV, 2010 WL 3895531, at *3 (Tenn. Ct. App. Oct. 5, 2010) (No Tenn. R. App. P. 11 application filed); *Mullins v. Harley-Davidson Yamaha BMW of Memphis, Inc.*, 924 S.W.2d 907, 910 (Tenn. Ct. App. 1996); *Davis Kidd Booksellers, Inc. v. Day-Impex, Ltd.*, 832 S.W.2d 572, 575 (Tenn. Ct. App. 1992). Invoking the five-part *Masada* test is no longer necessary.

Tennessee's Court of Appeals first utilized the *Burger King* two-step personal jurisdiction test in *Davis Kidd Booksellers*:

> The minimum contacts test has two steps. First, it requires the court to identify the contacts between the non-resident and the forum. Second, it requires the court to determine whether exercising personal jurisdiction based on these contacts is consistent with traditional notions of fair play and substantial justice. Both steps call for a careful, not mechanical, analysis of the facts of each case with particular

focus on the defendant, the forum, and the nature of the litigation.

The first step of the analysis is primarily a fact-gathering exercise. The second step involves some subjective value judgment by the court concerning the quality and nature of the defendant's contacts with the forum and the fair and orderly administration of the law. The court's judgment should be informed by considering, among other matters: the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the judicial system's interest in obtaining the most efficient resolution of controversies, and the state's shared interest in furthering fundamental, substantive social policies.

*Davis Kidd Booksellers v. Day-Impex*, 832 S.W.2d at 575 (citations omitted).

In *Davis Kidd*, the trial court and the parties viewed the case as an opportunity "to depart from the traditional 'minimum contacts' analysis and to embrace some version of the 'stream of commerce' analysis discussed but not adopted in *Asahi*." The Court of Appeals "decline[d] the invitation," because "[t]he United States Supreme Court itself cannot agree on a stream of commerce test" and the appeal could be decided under the traditional minimum contacts framework. *Davis Kidd Booksellers v. Day-Impex*, 832 S.W.2d at 574.

The Court of Appeals held in *Davis Kidd* that Tennessee lacked personal jurisdiction over a British manufacturer of sprinkler bulbs and its Pennsylvania distributor. A bookstore's inventory was badly damaged due to a defective component part in its sprinkler system. That component part, a glass bulb, was manufactured in Great Britain by Day-Impex. Day-Impex sold its sprinkler bulbs to its exclusive U.S. distributor, a Pennsylvania company named Sprinkler Bulb. Sprinkler Bulb sold the defective bulb in question to another distributor, a Massachusetts company named Firematic. The bookstore sued all three companies, plus the Nashville contractor and subcontractor who installed the sprinkler system. *Davis Kidd Booksellers v. Day-Impex*, 832 S.W.2d at 574.

The Court of Appeals found that Day-Impex and Sprinkler Bulb had not "purposely directed" their activities toward Tennessee and, therefore, had no contacts in this State. *Davis Kidd Booksellers v. Day-Impex*, 832 S.W.2d at 575-76. Neither Day-Impex nor Sprinkler Bulb had ever sold glass bulbs to anyone in Tennessee. Neither company had "advertised, solicited orders, or maintained an office or employees in Tennessee." No employees from either company had traveled to Tennessee to solicit business. There was no

-31-

proof of common ownership among the manufacturer or the distributors, and there was no evidence that Day-Impex or Sprinkler Bulb controlled any of Firematic's marketing activities or knew the identity of Firematic's customers. Accordingly, the Court of Appeals held that "[i]n the absence of any other conduct by Day-Impex or Sprinkler Bulb directed toward Tennessee, the nationwide distribution agreement is not evidence of a specific intent or purpose to serve the Tennessee market." *Davis Kidd Booksellers v. Day-Impex*, 832 S.W.2d at 576.

This Court also approved the two-step *Burger King* minimum contacts analysis in *Gordon v. Greenview Hospital, Inc.* We explained that a plaintiff must first prove by a preponderance of the evidence that the defendant has minimum contacts such that it "should reasonably anticipate being haled into court [in Tennessee]." *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d at 647 (quoting *Lindsey v. Trinity Commc'ns, Inc.*, 275 S.W.3d 411, 418 (Tenn. 2009)). We also noted that "[i]f the plaintiff can make that showing, the defendant will have the burden of showing that the exercise of specific jurisdiction would be unfair." *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d at 647.[29]

Another significant specific personal jurisdiction case is *Mullins v. Harley-Davidson Yamaha BMW of Memphis, Inc.* This wrongful death suit involved an allegedly defective motorcycle helmet. The helmet had been manufactured in South Korea by the Hong Jin Crown Corporation ("HJC"), which sold the helmet to a Massachusetts distributor, which sold the helmet to the Tennessee retailer. The Court of Appeals reasoned that asserting jurisdiction over HJC was not proper because:

---

[29]Although stated differently, the jurisdictional test employed by the United States Court of Appeals for the Sixth Circuit is identical in substance to our approach. As a Nashville federal court recently observed, the Sixth Circuit's three-part *Mohasco* test "remains an accurate statement of existing law" in that jurisdiction:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise [of] jurisdiction over the defendant reasonable.

*Energy Automation Sys., Inc. v. Saxton*, 618 F. Supp. 2d 807, 812 (M.D. Tenn. 2009) (quoting *Southern Mach. Co. v. Mohasco*, 401 F.2d 374, 381 (6th Cir. 1968)). In the Sixth Circuit, the "purposeful availment factor" is the "*sine qua non*" of personal jurisdiction. *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1273 (6th Cir. 1998). *Accord Baxter Bailey Inv., LLC v. Harrison Poultry, Inc.*, No. 11-3116, 2012 WL 4062771, at *6 (W.D. Tenn. Sept. 14, 2012).

HJC . . . maintains no offices or places of business in the United States. HJC sells its motorcycle helmets directly to the aforementioned distributors. Each distributor is "free to sell to any dealer of their choosing anywhere in the United States." HJC does not sell directly to dealers and does not suggest names of dealers to any of its distributors. HJC does not sell motorcycle helmets or any other products directly into the State of Tennessee. HJC transacts no business within the state; it maintains no offices or agents and owns no property within the state. HJC did not create or control the distribution system which brought any of its products into the state. HJC does not advertise or participate in the costs of advertising any of its products and does not solicit business in the state. Finally, HJC does not participate in the promotion, or pay any incentives for the promotion, of its products in Tennessee. . . . HJC was never aware to whom its helmets were ultimately sold or to whom they were sent . . . in the United States.

*Mullins v. Harley-Davidson*, 924 S.W.2d at 909.

The defendant in *Eubanks v. Procraft, Inc.* was a Canadian "liquid siding" manufacturer named Kryton International, which sold products to Kryton-Barbados in the West Indies, which shipped products to another company, Kryton Marketing Division, in Tennessee. *Eubanks v. Procraft, Inc.*, No. E2003-02602-COA-R9-CV, 2004 WL 1732315, at *1 (Tenn. Ct. App. Aug. 3, 2004) *perm. app. denied* (Tenn. Nov. 29, 2004). The Court of Appeals found that these shipments were "not evidence" that Kryton International "intended to serve the Tennessee market. . . . [M]erely shipping a product to Tennessee at the direction of Kryton-Barbados is not 'transacting business' within the state of Tennessee." *Eubanks v. Procraft, Inc.*, 2004 WL 1732315, at *2 (citing *Gibbons v. Schwartz-Nobel*, 928 S.W.2d 922, 925 (Tenn. Ct. App. 1996)). According to the *Eubanks* court, "[*Asahi, Davis Kidd*, and *Mullins*] establish that simply placing a manufactured item into the 'stream of commerce' does not suffice to establish personal jurisdiction," and "*Asahi* did not represent an exception to the traditional 'minimum contacts' analysis." The fact that Kryton International possessed "presumed knowledge that the products would be sold in Tennessee" was insufficient to establish personal jurisdiction. *Eubanks v. Procraft, Inc.*, 2004 WL 1732315, at *3.

*Attea v. Eristoff* contains a detailed and accurate statement of the law:

The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects an individual's liberty

-33-

interest in being free from binding judgments of a forum with which he or she has no meaningful contacts, ties, or relations. Due process requires that individuals be given "fair warning that a particular activity may subject them to the jurisdiction of a foreign sovereign." When a state court seeks to assert specific jurisdiction over a non-resident defendant who has not consented to suit there, the requirement of fair warning is satisfied as long as the defendant has "purposely directed" his or her activities at residents of the forum state, and the litigation stems from alleged injuries that "arise out of or relate to" those activities.

The touchstone of the due process analysis is whether the non-resident defendant has purposefully established "minimum contacts" in the forum state. Foreseeability of causing injury in the forum state alone is insufficient to satisfy the requirements of due process. Rather, the question is whether "the defendant's conduct and connection with the forum State are such that he [or she] should reasonably anticipate being haled into court there."

. . . .

[I]t is essential in each case that there be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."

*Attea v. Eristoff*, No. M2005-02834-COA-R3-CV, 2007 WL 1462206, at *2-3 (Tenn. Ct. App. May 18, 2007) (No Tenn. R. App. P. 11 application filed) (internal citations omitted). *See also Franklin American Mortgage v. Dream House Mortgage Corp.*, No. M2009-01956-COA-R9-CV, 2010 WL 3895531, at*9 (Tenn. Ct. App. Oct. 5, 2010) (No Tenn. R. App. P. 11 application filed) ("[A]lthough [the out-of-state defendant] can be charged with knowledge that its product would enter the stream of commerce, it did nothing to direct its activity toward Tennessee, nor did [the defendant corporation] purposely avail itself of the privilege of doing business in Tennessee. . . . [The defendant's] contacts with Tennessee are simply too tenuous to satisfy the due process requirements").

In *Precision Castings of Tenn., Inc. v. H & H Mfg.*, our Court of Appeals found that minimum contacts existed where a defendant Pennsylvania corporation solicited a Tennessee company to manufacture some custom parts and entered into a contract governed by

Tennessee law. The fact that no one from the out-of-state corporation "physically visited" Tennessee was "not dispositive" when the defendant "purposefully directed" its activities toward a Tennessee corporation and a breach of contract suit arose from injuries related to those activities. *Precision Castings of Tenn., Inc. v. H & H Mfg.*, No. M2012-00334-COA-R3-CV, 2012 WL 3608668, at *3 (Tenn. Ct. App. Aug. 22, 2012) (No Tenn. R. App. P. 11 application filed).

Our survey of Tennessee's leading specific personal jurisdiction cases reveals that Tennessee's appellate courts typically apply the minimum contacts test of *International Shoe*, as elaborated by *World-Wide Volkswagen* and *Burger King*, and that their application of this test is generally consistent with the "stream of commerce plus" doctrine employed by Justice O'Connor in *Asahi*.[30] Accordingly, the Court of Appeals' invocation of the Brennanesque "stream of commerce" analysis in this case departed from the approach traditionally employed by Tennessee's courts.

**D.**

Before we proceed to the particular facts of the case at bar, we will address what effect, if any, *J. McIntyre Machinery, Ltd. v. Nicastro* might have had on Tennessee law. We have already established that our interpretation of Tennessee's long-arm statute cannot extend the jurisdiction of Tennessee courts beyond what the Supreme Court of the United States would allow. The relevant question now is whether *J. McIntyre Machinery* altered the Supreme Court's jurisprudence on this subject or overruled some aspect of this Court's traditional approach.

Justice Kennedy's plurality opinion, which adopted a forum-specific analytical framework, is consistent with Tennessee's traditional approach to personal jurisdiction. Justice Kennedy held that targeting the national market provides an insufficient basis for jurisdiction in particular states. Tennessee courts have also indicated that the jurisdictional analysis must be forum-specific. In *Davis Kidd*, for example, the Court of Appeals held that "[a] nationwide distribution agreement is not evidence of a specific intent or purpose to serve the Tennessee market." *Davis Kidd Booksellers v. Day-Impex*, 832 S.W.2d at 576. In *Mullins*, the actions of a distributor that was "free to sell to any dealer . . . anywhere in the United States" did not confer jurisdiction in Tennessee. *Mullins v. Harley-Davidson*, 924 S.W.2d at 909. In *Eubanks*, merely shipping goods to Tennessee at the request of a national

---

[30]The only significant outlier is *McCombs v. Cerco Rentals*, 622 S.W.2d 822, 825 (Tenn. Ct. App. 1981), in which the Court of Appeals found that the purposeful availment requirement was satisfied when the defendant, a French corporation, "voluntarily inject[ed] his product into the stream of interstate commerce" and "should have reasonably foreseen that consequences could result in Tennessee."

distributor, with presumed knowledge that the goods would arrive in Tennessee, did not confer jurisdiction. *Eubanks v. Procraft, Inc.*, 2004 WL 1732315, at *2-3. These precedents comport with the principle identified by Justice Kennedy in *J. McIntyre Machinery* that "personal jurisdiction requires a forum-by-forum, or sovereign-by-sovereign, analysis. . . . [A] defendant may in principle be subject to the jurisdiction of the courts of the United States but not of any particular State." *J. McIntyre Mach.*, 131 S. Ct. at 2789.

However, in contrast to Justice Kennedy's focus on power and submission, our minimum contacts analysis has always been grounded in fairness and liberty. We have not been asking whether nonresident corporations have submitted themselves to the authority of Tennessee's courts, but whether it would be fair to expect them to defend lawsuits in our State. As the United States Supreme Court has previously stated, "[t]he personal jurisdiction requirement recognizes and protects an individual liberty interest." It is this "liberty interest" that is "preserved by the Due Process Clause," and which "represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982). *Cf. Attea v. Eristoff*, 2007 WL 1462206, at *2 ("The Due Process Clause . . . protects an individual's liberty interest . . . ."). *See also International Shoe*, 326 U.S. at 316 (grounding personal jurisdiction on "traditional notions of fair play and substantial justice"). Apart from this conceptual parting of ways, we find no inconsistency in the actual application of the minimum contacts test between Tennessee's leading precedents and the four-Justice *J. McIntyre Machinery* plurality opinion. *See* Adam N. Steinman, *The Lay of the Land: Examining the Three Opinions in* J. McIntyre Machinery, Ltd. v. Nicastro, 63 S.C. L. Rev. 481, 497-98 (2012) ("Ultimately, choosing to speak in terms of sovereignty or submission does not necessarily entail a substantive difference in terms of the permissible scope of jurisdiction. . . . In fact, most of Justice Kennedy's more general articulations of what will constitute such submission are uncontroversial and consistent with past precedent.").

However, Justice Kennedy's plurality opinion is not the controlling opinion in *J. McIntyre Machinery*. That role goes to the concurring opinion of Justice Breyer, joined by Justice Alito, under the rule of *Marks v. United States*, 430 U.S. 188 (1977). In its *Marks* opinion, the United States Supreme Court held that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).[31]

_____

[31]*But see Grutter v. Bollinger*, 539 U.S. 306, 325 (2003) ("[The *Marks* test] is more easily stated than
(continued...)

Most courts that have applied the *Marks* rule to *J. McIntyre Machinery* have determined that Justice Breyer's opinion was the judgment that concurred "on the narrowest grounds."[32] Perhaps writing with the *Marks* rule in mind, Justice Breyer characterized the plurality opinion as "a change to the law," and stated that his own opinion "adhere[s] strictly" to the Supreme Court's precedents. *J. McIntyre Mach.*, 131 S. Ct. at 2794 (Breyer, J., concurring). Justice Breyer explicitly disagreed with the plurality's "seemingly strict" rule that a defendant who does not intend to "submit to the power of a sovereign" cannot be said to have "targeted the forum." *J. McIntyre Mach.*, 131 S. Ct. at 2793 (Breyer, J., concurring). Instead, Justice Breyer held that the sale of a single item is insufficient to confer jurisdiction when the manufacturer merely placed the product in the national stream of commerce, knowing and hoping that the sale would occur in the forum state. This does strike us as the narrower of the two majority holdings, and, therefore, it is the controlling opinion under *Marks*.

Nevertheless, while Justice Breyer's opinion may be controlling, it fails to resolve the United States Supreme Court's impasse over the stream of commerce theory and, therefore, leaves existing law undisturbed. Unlike Justice Kennedy's plurality opinion, Justice Breyer's concurrence does not articulate a clear conceptual basis for its holding. *See* Effron, 16 Lewis & Clark L. Rev. at 883 (describing Justice Breyer's "equivocation about jurisdictional theories").

Justice Breyer's analysis in *J. McIntyre Machinery* can be described as a patchwork version of *Asahi*.[33] From Justice O'Connor's opinion in *Asahi*, Justice Breyer appropriated the idea that placing a product into the stream of commerce without "something more" than awareness that the stream "may or will sweep the product into the forum State" is insufficient for establishing jurisdiction. *J. McIntyre Mach.*, 131 S. Ct. at 2792 (Breyer, J., concurring) (quoting *Asahi*, 480 U.S. at 111-12). From Justice Brennan's concurrence in *Asahi*, Justice Breyer borrowed the idea that a sale must be part of "the regular and anticipated flow" of

---

[31](...continued)
applied to the various [Supreme Court] opinions. . . . It does not seem 'useful to pursue the *Marks* inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it.'" (quoting *Nichols v. United States*, 511 U.S. 738, 745-46 (1994))).

[32]*See, e.g.*, *UTC Fire & Sec. Americas Corp. v. NCS Power, Inc.*, 844 F. Supp. 2d 366, 376 (S.D.N.Y. 2012); *Ainsworth v. Cargotec USA, Inc.*, No. 2:10-CV-236-KS-MTP, 2011 WL 6291812, at *2 (S.D. Miss. Dec. 15, 2011); *Dram Techs. LLC v. America II Grp., Inc.*, No. 2:10-CV-45-TJW, 2011 WL 4591902, at *2 (E.D. Tex. Sept. 30, 2011); *Willemsen v. Invacare Corp.*, 282 P.3d 867, 873 (Or. 2012).

[33]One commentator describes Justice Breyer's legal analysis as a "fabricated . . . version of the applicable doctrine." Allan Ides, *Foreword: A Critical Appraisal of the Supreme Court's Decision in* J. McIntyre Machinery, Ltd. v. Nicastro, 45 Loy. L.A. L. Rev. 341, 371 (2012) ("Ides").

commerce, and not a mere "eddy," in order to confer personal jurisdiction. *J. McIntyre Mach.*, 131 S. Ct. at 2792 (Breyer, J., concurring) (quoting *Asahi*, 480 U.S. at 117). From Justice Stevens's concurring opinion in *Asahi*, Justice Breyer borrowed the idea that personal jurisdiction is affected by "the volume, the value, and the hazardous character" of the products, and by whether the sale is part of the company's "regular course of dealing." *J. McIntyre Mach.*, 131 S. Ct. at 2792 (Breyer, J., concurring) (quoting *Asahi*, 480 U.S. at 122). According to Justice Breyer, when *Asahi*'s separate opinions are patched together in this manner, they "strongly suggest[] that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." Thus, Justice Breyer concludes, "on the record present here, resolving this case requires no more than adhering to our precedents." *J. McIntyre Mach.*, 131 S. Ct. at 2792 (Breyer, J., concurring).

Justice Breyer's concurring opinion also featured an austere formulation of the factual record. Justice Breyer based his opinion solely on the "three primary facts" that the New Jersey courts identified as "constitutionally sufficient 'contacts'" with the state: (1) on one occasion McIntyre America sold and shipped one machine to a New Jersey customer; (2) McIntyre UK "permitted, indeed wanted, its independent American Distributor to sell its machines to anyone in America willing to buy them;" and (3) representatives of McIntyre UK attended trade shows several U.S. cities outside New Jersey. *J. McIntyre Mach.*, 131 S. Ct. at 2791-92 (Breyer, J., concurring). When he placed his *Asahi* quilt next to this condensed version of the factual record, Justice Breyer found that the "single isolated sale" was insufficient to confer jurisdiction.

While the New Jersey Supreme Court clearly followed Justice Brennan's broad version of the stream of commerce theory, it is not clear that even Justice Ginsburg's dissent endorsed Justice Brennan's approach. One commentator has described Justice Ginsburg's analysis in *J. McIntyre Machinery* as "grounded in purposeful availment, pure and simple." Adam N. Steinman, *The Meaning of* McIntyre, 18 Sw. J. Int'l L. 417, 438 (2012). Professor Steinman also described Justice Ginsburg's opinion as "entirely consistent with Justice O'Connor's requirement" that a defendant's actions must demonstrate an intent to serve the market in the forum state. Steinman, 18 Sw. J. Int'l L. at 438.

The facts which Justice Ginsburg emphasized in her dissenting opinion suggest that "Justice O'Connor's something-more standard" was "satisfied" in *J. McIntyre Machinery*. Ides, 45 Loy. L.A. L. Rev. at 385-86. As Justice Ginsburg explained, J. McIntyre UK set up its own exclusive independent U.S. distributor and assisted that distributor in selling its machines in New Jersey, the state with America's largest scrap metal market. Justice Ginsburg's analysis thus established purposeful availment and articulated how McIntyre UK

possessed something more than mere awareness that its products would enter New Jersey. It is not clear that Justice Breyer and Justice Ginsburg agree on the stream of commerce theory. Nor is it clear that either Justice endorses Justice Brennan's theory.

Accordingly, we do not read Justice Breyer's opinion as creating a Supreme Court majority that favors Justice Brennan's version of the stream-of-commerce test from *Asahi*. Instead, *J. McIntyre Machinery* merely preserves the doctrinal status quo. Few courts have felt compelled to alter their approach to personal jurisdiction in response to *J. McIntyre Machinery. See, e.g.*, *Ainsworth v. Cargotec USA, Inc.*, 2011 WL 6291812, at *4 ("*McIntyre* has little to no precedential value."); *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, No. MDL 2047, 2012 WL 3815669, at *21 (E.D. La. Sept. 4, 2012) ("Justice Breyer's concurrence provides a clear directive to the Court to apply existing Supreme Court precedent . . . ."); *Sieg v. Sears Roebuck & Co.*, 855 F. Supp. 2d 320, 327 (M.D. Pa. 2012) (adhering to Third Circuit precedent in light of the *J. McIntyre* majority's failure "to adopt clearly one of the two *Asahi* standards"); *Original Creations, Inc. v. Ready Am., Inc.*, 836 F. Supp. 2d 711, 716 (N.D. Ill. 2011) (noting that *J. McIntyre Machinery* neither overturned Supreme Court precedent on personal jurisdiction nor disturbed Federal Circuit precedent on the subject); *Lindsey v. Cargotec USA, Inc.*, No. 4:09-CV-00071-JHM, 2011 WL 4587583, at *7 (W.D. Ky. Sept. 30, 2011) (adhering to preexisting precedent post-*J. McIntyre Machinery*). According to one commentator, Justice Breyer's opinion "has done little beyond turning back the clock to precisely where it was after *World-Wide Volkswagen*." Effron, 16 Lewis & Clark L. Rev. at 885. Another commentator has noted that "Justice Breyer's concurrence . . . gives no hint as to whether it favors the Brennan or the O'Connor view of the stream of commerce, leaving lower courts marooned as before." Patrick J. Borchers, J. McIntyre Machinery, Goodyear*, and the Incoherence of the Minimum Contacts Test*, 44 Creighton L. Rev. 1245, 1265 (2011).

On the other hand, some courts and commentators have read the majority opinion in *J. McIntyre Machinery* as repudiating Justice Brennan's broad stream-of-commerce theory from *Asahi*. One federal court has said that "*McIntyre* clearly rejects foreseeability as the standard for personal jurisdiction," and observed that Justice Kennedy's and Justice Breyer's opinions "both firmly embrace the continuing significance of individual state sovereignty and . . . hold that specific jurisdiction must arise from a defendant's deliberate connection with the forum state." "Beyond this," the court said, "*McIntyre* merely affirms the status quo." The court therefore construed *J. McIntyre Machinery* as "rejecting the foreseeability standard of personal jurisdiction, but otherwise leaving the legal landscape untouched." *Windsor v. Spinner Indus. Co., Ltd.*, 825 F. Supp. 2d 632, 638 (D. Md. 2011). *See also Smith v. Teledyne Cont'l Motors, Inc.*, 840 F. Supp. 2d 927, 929, 931 (D.S.C. 2012) (finding that the "common denominator" in the reasoning of the *J. McIntyre Machinery* majority was the "'stream-of-commerce plus' rubric" enunciated by Justice O'Connor in *Asahi*, and that "the

'stream-of-commerce plus' test now commands a majority of the Court"); *Oticon, Inc. v. Sebotek Hearing Sys., LLC*, 865 F. Supp. 2d 501, 516 (D.N.J. 2011) ("Neither knowledge or expectation of sales to a particular forum state is enough to establish jurisdiction according to both the plurality opinion and the concurring opinion [in *J. McIntyre Machinery*]."); *Northern Ins. Co. of New York v. Construction Navale Bordeaux*, No. 11-60462-CV, 2011 WL 2682950, at *5 (S.D. Fla. July 11, 2011) (finding that, after *J. McIntyre Machinery*, "'something more' than merely placing a product into the stream of commerce is required for personal jurisdiction"). Shortly after *J. McIntyre Machinery*, a federal court in New Jersey found that the opinion had "overruled the line of cases exemplified by *Tobin* [*v. Astra Pharm. Prods., Inc.*, 993 F.2d 528 (6th Cir. 1993)], *Barone* [*v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610 (8th Cir. 1994)], and *Power Integrations*[*, Inc. v. BCD Semiconductor Corp.*, 547 F. Supp 2d 365 (D. Del. 2008)]," which held that "targeting the national market" imputes jurisdiction to all the forum states. *Oticon, Inc. v. Sebotek Hearing Sys., LLC*, 865 F. Supp. 2d at 513.

Like one of Dr. Rorschach's amorphous ink blots, Justice Breyer's opinion is susceptible to multiple interpretations. Thus, *J. McIntyre Machinery* fails to signal a change in the law. Like the court in *Davis Kidd*, we "decline the invitation" to adopt a broader approach to personal jurisdiction. *Davis Kidd Booksellers v. Day-Impex*, 832 S.W.2d at 574.

## VI.

Having fully analyzed the relevant legal background, we now return to the facts of the case at bar. We will first reiterate the law of specific personal jurisdiction, as it applies in Tennessee. The following summary is derived from *Burger King*, 471 U.S. at 471-78; *World-Wide Volkswagen*, 444 U.S. at 291-94; *International Shoe*, 326 U.S. at 316-19; *Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d at 645-49; and *Lindsey v. Trinity Commc'ns, Inc.*, 275 S.W.3d at 417-18.

Tennessee's long-arm statutes are designed to permit its courts to assert personal jurisdiction to the fullest extent authorized by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Due process permits a state to enforce its judgments against a defendant only when the defendant has sufficient minimum contacts with the state that jurisdiction does not offend traditional notions of fair play and substantial justice. Minimum contacts are present when the defendant's purposeful conduct and connection with the forum state are such that the defendant avails itself of the benefits and protections of the state's laws and should, therefore, reasonably anticipate being haled into that state's courts.

Assessing minimum contacts involves a two-part test. The first step is the fact-gathering exercise of identifying the relevant contacts. The plaintiff is required to establish that minimum contacts exist by a preponderance of the evidence. The court should consider the quantity of the contacts, their nature and quality, and the source and connection of the cause of action with those contacts. A defendant's contacts are sufficiently meaningful when they demonstrate that the defendant has purposefully targeted Tennessee to the extent that the defendant should reasonably anticipate being haled into court here.

If the court finds sufficient minimum contacts, then the inquiry should proceed to the second step. At step two, the defendant bears the burden of showing that, despite the existence of minimum contacts, exercising jurisdiction would be unreasonable or unfair. The court, at this stage, should consider such factors as the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the judicial system's interest in obtaining the most efficient resolution of controversies, and the state's interest in furthering substantive social policies.

We will now apply this minimum contacts test to the facts of the case at hand.[34] Our first task is to identify NV Sumatra's contacts with Tennessee. We must then weigh the quantity of those contacts, their nature and quality, and their connection to the cause of action. The ultimate purpose is to determine whether the contacts demonstrate that NV Sumatra has purposefully availed itself of Tennessee's laws, such that it should reasonably anticipate being haled into court here. If not, then exercising jurisdiction over NV Sumatra would automatically be deemed unfair under the Due Process Clause.

The record establishes that NV Sumatra was aware by July 9, 2001, at the latest, that its cigarettes were being sold in Tennessee. In a letter bearing that date, NV Sumatra's executive director refers to the sales of United brand cigarettes in Tennessee and expresses concern over Tennessee's Escrow Fund Act. But, as the United States Supreme Court has instructed us, awareness alone is insufficient for establishing minimum contacts. In *J. McIntyre Machinery*, the plurality and concurring opinions both cited Justice O'Connor's discussion in *Asahi*, where she asserted that "something more" is necessary beyond the mere awareness that the stream of commerce "may or will sweep the product into the forum State." *See J. McIntyre Mach.*, 131 S. Ct. at 2789-90 (plurality opinion); 131 S. Ct. at 2792 (Breyer, J., concurring) (quoting *Asahi*, 480 U.S. at 111-12). The record also shows that NV Sumatra stopped shipping cigarettes to FTS around the same time it sent this letter.

---

[34]We note that the Chief Justice's dissenting opinion adopts the same analytical framework for assessing personal jurisdiction as the majority opinion. The diverging outcomes result primarily from our differing interpretation of several facts in the record and the weight that should be accorded those facts.

Because the record does not reveal that any agent of NV Sumatra has ever entered the State of Tennessee, the State's case is mainly premised on the sales of NV Sumatra's cigarettes here. The State summarizes these contacts as follows:

> NV Sumatra, through intermediaries designated by NV Sumatra to import its cigarettes into the United States, sold over 11.5 million cigarettes to Tennessee consumers over a three-year period. The volume of sales establishes a clear indication of NV Sumatra's deliberate intent to sell in Tennessee and NV Sumatra's knowledge of such sales.

In addition to these sales, the State also asks us to consider what the State describes as "NV Sumatra's contacts at the national level." First, NV Sumatra hired counsel in the United States to assist the company in filing three trademark applications for its United brand cigarettes. Second, the State asserts that NV Sumatra filed its ingredients list with the Office of Health and Human Services for the years 2000 and 2001. The record, however, indicates that it was actually FTS, through its attorney, that filed the ingredients list in 2000. Third, NV Sumatra packaged its Indonesian-made cigarettes with the labeling necessary for sale in the United States. This included syncing the United brand packages with the federal government's rotation of the Surgeon General's warnings.

First, we turn our attention to NV Sumatra's "contacts at the national level." Under existing United States Supreme Court precedent, we cannot find that such contacts are completely irrelevant to the minimum contacts analysis. It is clear, however, that such national contacts *alone* cannot justify jurisdiction in an individual state.[35]

When we consider the quantity, nature, and quality of NV Sumatra's national contacts, they do not add up to much. Filing a trademark application, submitting an ingredients list, and conforming the packages to federal standards are the minimal things a cigarette manufacturer must do to enable its products to be sold in the United States.[36] In terms of marketing, the record establishes that NV Sumatra gave Mr. Battah some United brand

---

[35] *See*, e.g., *World-Wide Volkswagen*, 444 U.S. at 293 ("[W]e have never accepted the proposition that state lines are irrelevant for jurisdictional purposes, nor could we, and remain faithful to the principles of interstate federalism embodied in the Constitution.") Even Justice Ginsburg, dissenting in *J. McIntyre Machinery*, went into great detail explaining how the British manufacturer purposefully availed itself of the New Jersey – not merely the national – market.

[36] It is not clear from this record whether NV Sumatra's use of the term "American Blend" or its choice of package design was intended to make its cigarettes more appealing in the United States market or in foreign markets where American cigarettes are popular.

posters to display in stores. Also, the United brand cigarette packages prominently displayed the words "American Blend," accompanied by stripes and a flying eagle. These minimal regulatory and marketing measures are either less than or equal to what we have seen in other cases where jurisdiction was lacking, such as *J. McIntyre Machinery*, 131 S. Ct. at 2790-92, 2796, 2803 (noting that the manufacturer aggressively marketed its machines at U.S. trade shows) and *Mullins v. Harley-Davidson*, 924 S.W.2d at 909 (noting that the South Korean manufacturer attended U.S. trade shows and engineered the helmets it sold in America to comply with standards and regulations in the United States).

This paucity of national contacts slips into sharper focus when we consider what the record does not reveal. The record does not reveal, for example, an aggressive advertising campaign aimed at the United States. NV Sumatra itself sent no representatives to trade shows in the United States. Nor is there even evidence of Internet sales targeting United States markets. Even if we assume that agents of NV Sumatra met with Mr. Battah in Florida once or twice, that minimal physical contact with the United States is not the type or quality of contact that would suggest jurisdiction is proper in Tennessee. This is especially true when NV Sumatra took steps to stop the sale of its cigarettes in the United States shortly thereafter. Mr. Battah practically begged NV Sumatra to assist him in targeting the U.S. market for United brand cigarettes, but NV Sumatra declined his invitation. NV Sumatra established only token contacts with the United States, and the connection of these few contacts to Tennessee is extremely attenuated.

Accordingly, the outcome of this jurisdictional issue hinges on the sales of 11.5 million United brand cigarettes in Tennessee. Sales can count as contacts. However, the sales in this case are so attenuated they do not establish meaningful contacts between the Indonesian manufacturer and the State of Tennessee.[37]

---

[37]We are aware that, in an almost identical lawsuit, the Supreme Court of South Carolina has held that it wielded specific personal jurisdiction over NV Sumatra for its violations of South Carolina's Escrow Fund Act. The Supreme Court of South Carolina, adopting Justice Brennan's version of the stream of commerce approach, held that "[r]egardless of how the cigarettes arrived in South Carolina," minimum contacts existed under essentially the same facts that we confront today. *State v. NV Sumatra Tobacco Trading Co.*, 666 S.E.2d 218, 223 (S.C. 2008). Suffice it to say that, especially in the wake of *J. McIntyre Machinery*, we do not consider it proper to follow South Carolina in eschewing the stream of commerce plus approach that is currently the law of this state. *See State v. NV Sumatra*, 666 S.E.2d at 222 n.5. It is our view that the United States Supreme Court's precedents, including all three opinions in *J. McIntyre Machinery*, place a degree of importance on "how the [products] arrived" in the state. *See, e.g., J. McIntyre Mach.*, 131 S. Ct. at 2796-97, 2801 (Ginsburg, J., dissenting) (emphasizing how McIntyre UK cooperated with its exclusive United States distributor to target the United States, specifically New Jersey, the state with the largest scrap metal market).

Quantity of sales is a relevant factor in our minimum contacts analysis, and the quantity of sales here is nothing to sneeze at. The parties have various views concerning how these cigarettes should be measured. The Escrow Fund Act taxes manufacturers by the cigarette, and the record indicates that 11,592,800 United brand cigarettes were sold in Tennessee. Consumers, however, buy the cigarettes by the package or by the carton. Each package contains twenty cigarettes, and each carton contains ten packages. This means that 579,640 packages, or 57,964 cartons of United brand cigarettes were sold in Tennessee. The cigarettes are shipped in cases, and each case contains 50 cartons. This suit therefore involves 1,159 cases of cigarettes being shipped to Tennessee. None of these quantities is insignificant.[38]

But quantity alone is not dispositive. We must also consider the nature and quality of these sales and their connection to the cause of action. In this case, the connection of the cigarette sales to the cause of action could not be greater. The State's lawsuit alleges that the cigarettes were sold in violation of the Tennessee Tobacco Manufacturers' Escrow Fund Act of 1999. Instead, the jurisdictional problem here revolves around the quality and nature of these sales.

The State insists that the heightened regulatory liability that attaches to cigarette sales weighs in favor of asserting jurisdiction. Most specific personal jurisdiction cases are products liability cases. They typically involve the sale of a single defective product, such as a sprinkler bulb, a motorcycle helmet, a metal shearing machine, or a tire valve. Here, in contrast, by virtue of the Tennessee Tobacco Manufacturers' Escrow Fund Act, every single United brand cigarette sold in Tennessee generated legal liability for NV Sumatra. The State argues that this difference warrants a broader approach to specific personal jurisdiction. However, specific personal jurisdiction has always focused primarily on the defendant, the forum, and the meaningful connections between them. We do not believe the existence of

---

[38] It is also instructive to consider the significance of the sales of United brand cigarettes in Tennessee between 2000 and 2002 in the context to the sales of cigarettes in the United States during the same period. According to the Federal Trade Commission, the six major United States cigarette manufacturers sold 1.2 trillion cigarettes in the United States during the same period. FTC, Cigarette Report for 2000, *available at* http://ftc.gov/os/2002/05/2002cigrpt.pdf (reporting domestic sales of 413.5 billion cigarettes in 2000); FTC, Cigarette Report for 2001, *available at* http://ftc.gov/os/2003/06/2001cigreport.pdf (reporting sales of 398.2 billion cigarettes in 2001); FTC, Cigarette Report for 2002, *available at* http://ftc.gov/reports/cigarette/041022cigaretterpt.pdf (reporting sales of 376.4 billion cigarettes in 2002). In 2002 alone, these manufacturers gave away 11.1 billion cigarettes in the United States. *See* Cigarette Report for 2002, at 2. Thus, the number of cigarettes that the major domestic manufacturers *gave away* in 2002 is *one thousand times greater* than the total amount of United brand cigarettes that were sold in Tennessee between 2000 and 2002.

a regulatory regime like the MSA requires us to alter the traditional constitutional minimum contacts calculus.

The fundamental issue with the sales of United brand cigarettes in Tennessee is that NV Sumatra had almost nothing to do with them. This is a classic case of a company placing its items into the international stream of commerce without anything "more" to demonstrate a specific interest in Tennessee. The record reveals that the arrival of NV Sumatra's cigarettes in Tennessee was almost wholly attributable to the initiative of Mr. Battah and FTS, his tobacco distribution company.

In his depositions, Mr. Battah insinuated that FTS and NV Sumatra cooperated directly in bringing the United brand cigarettes to the United States. He suggested that the intervening distribution companies, Unico and Silmar, were unnecessary "smoke screens and mirrors" that acted as "filters" between NV Sumatra and FTS.

However, the documentary evidence repudiates the implication that NV Sumatra exerted any control over the destination of the cigarettes it sold to Unico. Mr. Battah ordered the United brand cigarettes from Mr. Hawe of Silmar, whom Mr. Battah "assumed" to be an employee of NV Sumatra. This assumption was shown to be incorrect. NV Sumatra shipped United brand cigarettes, through Unico, to whatever destination Silmar requested. The record contains numerous receipts, bills of lading, and other documents that chart how the ownership and control over the United brand cigarettes passed from company to company on their way to Miami (and from there to Tennessee).

Additionally, as the trial court noted in its August 18, 2010 order, the State did not dispute that (1) NV Sumatra "does not own or have any interest in" Unico or Silmar, or vice-versa; (2) NV Sumatra does not have any contractual relationship with Silmar "permitting or authorizing the sale of United brand cigarettes in Tennessee;" (3) NV Sumatra has no ownership interest in FTS, and vice-versa; and (4) "FTS had complete ownership" of the United brand cigarettes it purchased from Silmar. We cannot, as Mr. Battah did, conflate three legally and managerially independent companies – headquartered in three different countries – in order to exert jurisdiction over a manufacturer that remained mostly aloof from the international marketing and distribution of its cigarettes. Mr. Battah's unsubstantiated legal conclusions, such as that NV Sumatra, Unico, and Silmar are interchangeable, are not the sort of factual evidence that courts must accept as true when ruling on a motion to dismiss for lack of personal jurisdiction.

NV Sumatra had no hand in setting up FTS. NV Sumatra exercised no control over FTS. NV Sumatra did not even seek out FTS to distribute its cigarettes. When Mr. Battah solicited NV Sumatra's cooperation in targeting the Tennessee market, NV Sumatra brushed

aside his entreaties. As soon as NV Sumatra learned of its products' sales in Tennessee – and the legal ramifications of these sales – it severed its few ties with FTS and sent FTS no more cigarettes. In other words, it was Mr. Battah's purposeful activities, not NV Sumatra's, that were the *proximate* cause of the sale of United brand cigarettes in Tennessee.[39] To borrow language from *Burger King*, the arrival of United brand cigarettes in Tennessee materially resulted from the "unilateral activity of another party," namely Mr. Battah. NV Sumatra did not *itself* "deliberately" engage in "significant activities" within the State or create "continuing obligations" with Tennessee residents. *Burger King*, 471 U.S. at 475-76.

One key principle underlying the minimum contacts test is that foreign companies should have notice of where they will be susceptible to suit so they can structure their business to know where they might face liability. As the United States Supreme Court explained in *World-Wide Volkswagen*, when a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," it has "clear notice that it is subject to suit there," and can act to alleviate the risk of litigation by, among other things, "severing its connection with the State." *World-Wide Volkswagen*, 444 U.S. at 297 (quoting *Hanson v. Denckla*, 357 U.S. at 253). The present case illustrates this principle precisely. Once NV Sumatra became aware that it could be sued in states that had adopted the Tobacco Manufacturers' Escrow Fund Act, the company withdrew its products from the United States market. NV Sumatra deliberately chose *not* to avail itself of the privilege of conducting business in Tennessee.

This case, therefore, illustrates *World-Wide Volkswagen*'s foreseeability principle. Because NV Sumatra made no "effort" to "serve directly or indirectly" the Tennessee market, the company had no effort-based "expectation" that its products would arrive here and subject the company to legal liability.[40] All of the marketing and sales "effort" in this case

---

[39] As the United States Supreme Court noted in *Burger King*, when defendants "'purposefully derive benefit' from their interstate activities," it is not unfair for these companies to face suit "in other States for consequences that arise *proximately* from such activities. . . . Jurisdiction is proper," the Court said, "where the contacts *proximately* result from actions by the defendant *himself* that create a substantial connection with the forum State" *Burger King*, 471 U.S. at 473-75 (first and second emphases added) (internal quotation marks and citations omitted). *Accord Asahi*, 480 U.S. at 109.

[40] As the United States Supreme Court explained in *World-Wide Volkswagen*, "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." The relevant "expectation" that a company's product will be purchased in the forum state "arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product" in that state. *World-Wide Volkswagen v. Woodson*, 444 U.S. at 297-98.

is attributable to Mr. Battah and FTS, a company which had few ties to NV Sumatra beyond purchasing and re-selling its United brand cigarettes.

Although this is not a product liability case, NV Sumatra's relationship to Tennessee can be compared with that of the defendant in *Davis Kidd*. The British manufacturer in *Davis Kidd* had an exclusive national distribution agreement with an American company, Sprinkler Bulb. The Court of Appeals held that this agreement, absent other conduct by the British manufacturer directed at Tennessee, failed to establish personal jurisdiction. Here, NV Sumatra had no contractual relationship with any American distribution company. Two independent foreign companies stand between the manufacturer and FTS, the national U.S. distributor. Even more so than in *Davis Kidd*, we can discern no "evidence of a specific intent or purpose to serve the Tennessee market." *Davis Kidd Booksellers v. Day-Impex*, 832 S.W.2d at 576.

In terms of relevant personal contacts, NV Sumatra is situated similarly to the South Korean motorcycle helmet manufacturer in *Mullins*. Like that company, NV Sumatra "maintains no offices or places of business in the United States." It sells its products to independent distributors, which are "free to sell to any dealer of their choosing anywhere in the United States." NV Sumatra "transacts no business" in Tennessee and has no agents and owns no property within the State. Like the South Korean manufacturer in *Mullins* and unlike McIntyre UK, NV Sumatra "did not create or control the distribution system" that brought its products into the State. NV Sumatra does not advertise, solicit business, or personally promote its products here. Until Mr. Battah sent his unsolicited sales reports to NV Sumatra, it appears that the company "was never aware to whom its [cigarettes] were ultimately sold or to whom they were sent" in the United States. *Mullins v. Harley-Davidson*, 924 S.W.2d at 909. Even then, like the Canadian "liquid siding" manufacturer in *Eubanks v. Procraft, Inc.*, 2004 WL 1732315, at *2-3, NV Sumatra's "presumed knowledge" that its products were sold in Tennessee does not confer jurisdiction.

This record reveals that NV Sumatra had no meaningful contacts with Tennessee. Beyond the act of placing its United brand cigarettes in the international stream of commerce, NV Sumatra's targeted behavior at the United States was minimal at most. It had no specific interest in Tennessee. The company's awareness – largely after the fact – that its cigarettes were being sold in Tennessee fails to evidence purposeful availment of the Tennessee market. Based on the attenuated nature and quality of the sales of NV Sumatra's cigarettes in Tennessee, we do not find that these sales amounted to minimum contacts sufficient for NV Sumatra to reasonably expect being haled into court in Tennessee. The *International Shoe* does not fit; NV Sumatra cannot wear it. We therefore have no need to proceed to the second step of the minimum contacts analysis.

In personal jurisdiction cases, the law requires us to follow the United States Supreme Court's lead. The Court declined to substantively alter the traditional minimum contacts inquiry in *Asahi* and *J. McIntyre Machinery*. We certainly will not do so here. If New Jersey lacked jurisdiction over J. McIntyre Machinery, which vigorously and directly targeted American markets, including New Jersey, then Tennessee surely lacks jurisdiction over NV Sumatra.

## VII.

The courts of Tennessee lack personal jurisdiction over NV Sumatra because the State of Tennessee has failed to establish, by a preponderance of the evidence, that NV Sumatra purposely availed itself of the privilege of doing business in Tennessee. Accordingly, the judgment of the Court of Appeals is reversed and the trial court's dismissal of the State's complaint for lack of personal jurisdiction under Tenn. R. Civ. P. 12.02(2) is affirmed. The costs of this appeal are taxed to the State of Tennessee.

_____
WILLIAM C. KOCH, JR., JUSTICE